This is a fraud case in which the jury returned a verdict in favor of the plaintiff, Myrtie M. Brady, and judgment was entered thereon. The defendant, Dr. Richard E. Kabel, appeals from the trial court's order denying his post-judgment motion for judgment notwithstanding the verdict or in the alternative a new trial or in the alternative a remittitur. We affirm.
On August 26, 1983, Mrs. Brady went to Dr. Kabel's chiropractic clinic in Oxford, Alabama, for a hearing examination. In addition to offering the usual chiropractic services, the Kabel Clinic contained a hearing department in which Dr. Kabel performed hearing examinations and fitted patients with hearing aids. At the conclusion of Dr. Kabel's examination of Mrs. Brady, he recommended that she purchase two new hearing aids. She made a down payment of $300.02 toward a total purchase price of $1,608.02 for a pair of hearing aids. Since the Kabel Clinic provided fitting services but did not have a full inventory of hearing aids, the parties understood the clinic would place an order with a manufacturer/supplier of the hearing aids. Dr. Kabel testified that the normal period between the placing of an order and the delivery of the hearing aids was from four to six weeks. He further stated that Mrs. Brady was informed of the customary delay and that the clinic lent her a single hearing aid to replace her previous one until her new set arrived.
Several days later, on August 29, 1983, Mrs. Brady returned to the clinic with her sister, Mrs. Louise Mitchell, in order for Dr. Kabel to perform a hearing examination on Mrs. Mitchell, who had also been having some problems with her hearing. Mrs. Brady accompanied her sister through the examination process and the consultation with Dr. Kabel that followed. During this discussion after the test, Mrs. Mitchell decided to order two hearing aids of the gold canal type. Mrs. Brady liked her sister's choice so well that she changed her previous order with Dr. Kabel so as to receive the more expensive gold canal hearing aids. At that time, Mrs. Brady made an additional down payment of $500 toward a total price of $2,420 for the new set.
Furthermore, Mrs. Brady testified that she had a conversation with Dr. Kabel during this second visit to the clinic concerning what, if anything, Medicare would pay toward the cost of these hearing aids. She claims that Dr. Kabel represented to her that the cost of the hearing aids "would be taken care of" by Medicare. Dr. Kabel testified to the contrary:
 "Q. Didn't you have a conversation with Mrs. Brady about Medicare?
"A. No, sir, never.
 "Q. You never talked to the lady whatsoever about Medicare?
 "A. Never, ever, ever talked to Mrs. Brady about Medicare."
Dr. Kabel maintains that he never personally spoke to Mrs. Brady concerning Medicare and that he normally allows his staff to handle matters involving fees and insurance. Dr. Kabel's wife and part-time assistant at the clinic, Terry Kabel, testified that she did discuss Medicare benefits with Mrs. Brady during one of Mrs. Brady's subsequent trips to the clinic and that she "made it clear to her [Mrs. Brady] that Medicare wouldn't pay for anything she would have done" at the clinic. *Page 914 
After ordering the second set of hearing aids on August 29, 1983, Mrs. Brady returned to the clinic two days later, on August 31. Mrs. Brady maintains that the third visit was for the purpose of checking, per Dr. Kabel's instructions, to see if her hearing aids had arrived from the supplier. They had not been delivered, and Mrs. Brady testified that at that point Dr. Kabel took her back to his office and entered into a discussion of the human skeletal structure, explaining to her that he could perform tests which might aid him in diagnosing and ultimately correcting her hearing problem.
Dr. Kabel concedes that Mrs. Brady did return to his office on August 31, but he argues that she made the visit for the express purpose of having a "physical consultation" with him. Dr. Kabel's office assistant, Charlene Seymour, is in accord with him and testified that Mrs. Brady came to the clinic to talk to the doctor "about an examination for her health problems" and that she believed that Mrs. Brady "came in just for the consultation." In any event, Mrs. Brady did agree to allow Dr. Kabel to perform a physical examination consisting of a series of diagnostic tests.
While these tests were to be performed on September 8, 1983, Dr. Kabel did take a case history and had a discussion with Mrs. Brady concerning the fees on the date of the "physical consultation," August 31. Mrs. Brady also filled out a "Symptom Survey Form" on that date. Dr. Kabel recorded Mrs. Brady's case history on a form with the heading "Case Record." In the preprinted category entitled "History of Illness and Treatment," Dr. Brady wrote the words, "right ear pain — goes down jaw," and in the line above, "onset last 3-4 days." The remainder of the form contains the history of Mrs. Brady's health problems and her current condition. However, in completing this form, Dr. Kabel apparently ignored the preprinted category headings on the form and utilized his own format (e.g., noting daily bowel movements beside the heading "Present Illness or Complaints").
In completing the "Sympton Survey Form," Mrs. Brady checked 20 items from a listing of various bodily ailments. Her complaints ranged from a "nervous stomach" to brown points on her skin and included "ringing in ears" and "impaired hearing." Dr. Kabel provided Mrs. Brady with an outline of the tests he would perform and assigned a fee to each procedure, reaching a total of $565 for the proposed examination.
Again, there is a controversy over the representations involving Medicare coverage. Mrs. Brady alleges that Dr. Kabel told her that, in addition to the cost of her hearing aids, the cost of the physical examination would be covered by Medicare as well. She also stated that she was never told of the fact that Medicare refuses to pay for most chiropractic services, and that she never would have agreed to the tests had she known that Medicare would not pay for them. On the other hand, Dr. Kabel maintains that henever spoke to Mrs. Brady about Medicare, and, furthermore,Mrs. Kabel testified that she clearly told Mrs. Brady that Medicare would not pay for her "hearing aids, examinations, or whatever."
Thereafter, Mrs. Brady returned to the clinic on September 8, 1983. At that time, Dr. Kabel performed a physical examination on her, consisting of various tests and X-rays, a colon examination, a breast examination, an enema, and a Pap smear. In addition, he obtained specimens of her blood and urine to be forwarded to a laboratory for analysis. Mrs. Brady contends that Dr. Kabel recommended that he perform a Pap smear (a procedure not listed in the original outline she had received) and that she had not requested one. In direct contrast, Charlene Seymour testified that this additional procedure was at Mrs. Brady's request:
 "Q. Did Mrs. Brady say anything to you about a Pap smear?
 "A. She said since she was going to get an examination that she may as well just go ahead and get a Pap smear, too."
After the completion of the physical examination, Mrs. Brady signed an assignment *Page 915 
of payment form that authorized the direct payment of any insurance proceeds to Dr. Kabel. This document also bound Mrs. Brady to personally pay the full amount of the clinic's charge in the event of noncoverage. In addition, she signed a blank Medicare payment request form. Mrs. Kabel testified that although Mrs. Brady was told that Medicare would not pay for her charges at the clinic, Mrs. Brady requested that the clinic file a claim with Medicare for another purpose, viz., so that she would have proof of Medicare's rejection of the claim in order for her other insurance to provide coverage. Mrs. Brady, on the other hand, testified that Dr. Kabel's staff had asked her to sign the forms.
Regardless of who suggested that the claim be filed, the Kabel Clinic did indeed file a Medicare payment request form with Blue Cross-Blue Shield of Alabama. According to the testimony, Charlene Seymour marked the box labeled "I accept assignment" in the section on the form entitled "Assignment of Patient's Bill." Dr. Kabel and his wife both claim that this notation on the Medicare form was simply a mistake and that the Kabel Clinic has never been in the practice of accepting assignments from Medicare. Apparently, Mrs. Kabel discovered the mistake months after the original claim had been filed and rejected by Medicare. When she brought the mistake to Dr. Kabel's attention, he asked Mrs. Seymour to "correct" the clinic's copy of the form by changing the assignment section so as to mark the box labeled "I do not accept assignment." The clinic never filed this corrected form.
Nevertheless, the Kabel Clinic initially filed anassigned claim for $609. The discrepancy of $44 between the estimated fee ($565) and the final bill can be accounted for largely by the additional cost of the Pap smear. Medicare denied payment for the claim and sent Mrs. Brady a notice of the denial of benefits, stating that Dr. Kabel's chiropractic services were not covered by Medicare in her case. Although the testimony clearly indicates that the clinic's claim was originally an assigned claim, the notification of benefits form sent by Medicare to Mrs. Brady states that the claim was"unassigned," apparently a Medicare mistake.
Mrs. Brady was involved in an automobile accident soon after her physical examination at the clinic. While hospitalized in Birmingham, Mrs. Brady apparently received advice from a physician there that she should cancel her order for hearing aids at the Kabel Clinic. She testified that when she requested a refund of $800.02 (her down payment), Dr. Kabel refused to pay, and that she never received either a refund or the hearing aids themselves.
Thereafter, Charlene Seymour visited Mrs. Brady in her home and requested payment of the clinic bill. At that time, Mrs. Brady wrote a check payable to Dr. Kabel for $609, the full charge for the physical examination. This check was dated October 21, 1983. Mrs. Brady claims that she did not receive the denial of benefits form from Medicare until November, yet the Medicare form was dated October 18, 1983. At the time Mrs. Brady sent the check, she forwarded a letter to Dr. Kabel asking him to send her a report of the examination so that she could file a claim with National Foundation Life Insurance Company. She had previously given signed claim forms for Aetna Insurance Company to Dr. Kabel so that the clinic could file this claim directly. The record does not indicate if either of these insurance companies paid on these claims.
Mrs. Brady commenced this action against Dr. Kabel on November 2, 1984, in Calhoun Circuit Court. In her complaint, Mrs. Brady stated a claim in fraud, alleging that Dr. Kabel represented to her that "he could perform various tests and examinations upon her to determine the cause of her hearing loss condition and that upon her completion of this examination he would be able to prescribe treatment for her concerning said condition." Mrs. Brady further alleged that Dr. Kabel "represented to her that the costs for this examination would be covered by Medicare and that she would not have to pay anything as he would submit the bill to Medicare for this treatment." Mrs. Brady claimed that *Page 916 
she relied on these representations and that she had learned that both of them were false. Mrs. Brady claimed punitive damages in addition to $609, the cost of the physical examination. In due course, the case proceeded to trial before a jury, which returned a verdict in favor of Mrs. Brady in the amount of $162,500. Judgment on the verdict was entered, and Dr. Kabel's post-judgment motion was denied. This appeal followed.
Essentially, three issues are presented for our review:
(1) Did the plaintiff's complaint state her fraud claim with the requisite particularity so as to comply with Rule 9(b), A.R.Civ.P.?
(2) Did the trial court err in admitting evidence that Dr. Kabel had had other patients complain that he had made false representations involving Medicare?
(3) Was the jury's award excessive and against the weight of the evidence?
 I.
Rule 9(b), A.R.Civ.P., states the requirements for pleading a claim in fraud as follows:
 "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."
According to the committee comments to Rule 9:
 "[T]his special requirement as to fraud . . . does not require every element in such actions to be stated with particularity. It simply commands the pleader to use more than generalized or conclusory statements to set out the fraud complained of. The pleading must show time, place and the contents or substance of the false representations, the fact misrepresented, and an identification of what has been obtained. . . ."
The purpose of this special pleading provision is to give fair notice of the alleged fraud to the opposing party.Winn-Dixie Montgomery, Inc. v. Henderson, 371 So.2d 899 (Ala. 1979); Caron v. Teagle, 345 So.2d 1331 (Ala. 1977).
Defendant contends that Mrs. Brady's allegations of fraud in the complaint are vague and ambiguous and that the complaint failed to provide him with fair notice that the fraud claim was based on the alleged misrepresentations involving the "physical consultation" on August 31, 1983, and the physical examination on September 8, 1983. The pertinent section of the complaint states:
 "1. Heretofore on or about September 13, 1983, plaintiff was advised by Richard E. Kabel that he could perform various tests and examinations upon her to determine the cause of her hearing loss condition and that upon her completion of this examination he would be able to prescribe treatment for her concerning said condition. Plaintiff would further state that said defendant represented to her that costs for this examination would be covered by Medicare and that she would not have to pay anything as he would submit the bill to Medicare for this treatment.
 "2. Plaintiff would state that she relied upon these representations aforesaid and allowed him to perform the examination upon her and thereafter she subsequently received a bill from said defendant for $609.00 which she subsequently paid." (Emphasis added.)
Dr. Kabel argues that the complaint refers solely to Mrs. Brady's initial hearing examination and her subsequent ordering of hearing aids, events taking place on August 26 and 29, 1983. In his brief, appellate counsel for Dr. Kabel attacks the trial court's admission of evidence involving the physical
examination:
 "[T]hese physical examinations are not part of damages arising out of the fraud action as they stem from a physical examination that took place at a time after the alleged fraud took place. This physical examination was an independent physical examination in nature and purpose done at the chiropractic clinic whereas the alleged fraud took place out of an earlier hearing test at the ear clinic. Due to the remoteness and independence in nature and purpose of this later physical examination, it is obvious that *Page 917 
this proof was unrelated to the assertions of fraud and should have been excluded from evidence. What does evidence of a Pap smear, blood tests, or colon examinations have to do with whether or not Medicare would pay for Mrs. Brady's hearing aid?" (Emphasis in original.)
While Dr. Kabel's appellate counsel interprets the allegations in the complaint as referring solely to the hearing test, it was apparently clear to Dr. Kabel's trial counsel that the fraud claim as stated in the complaint was connected with the physical examination. During the trial, after plaintiff's counsel adduced evidence of the hearing test and then attempted to introduce the bills for the hearing aids, Dr. Kabel's trial counsel objected:
 "MR. HALSEY: We object to that, Your Honor. You'll notice in the complaint, they claimed $609 for a physical exam. This is not in issue, the amount charged for the hearing services.
 "THE COURT: What is the basis for your offering that?
 "MR. TINNEY: Your Honor, we feel that it would be probative in a fraud suit to establish any other acts that the defendant may have done to promote the fraud that he's accused [of], and we contend that this is evidence that would go to other acts.
 "MR. HALSEY: It's outside the scope of the pleadings, Your Honor. They didn't charge him with fraud in anything to do with the hearing in —
"THE COURT: Overruled. I'll allow it in.
". . . .
 "MR. HALSEY: We object on the same grounds, Your Honor, that it's outside the scope of the pleadings. The only fraud charge in connection with this is [the] bill for $609 for a physical exam.
"THE COURT: Overruled. I'll allow it in."
We find that the complaint was sufficient to place the defendant under fair notice as to the nature and subject of Mrs. Brady's claim in fraud, i.e., that it involved the allegedly fraudulent physical consultation and examination. Since the complaint sets out with sufficient particularity the facts constituting fraud as required by Rule 9(b), A.R.Civ.P., we find no merit in Dr. Kabel's argument of unfair surprise and prejudice
 II.
The second issue presented for our review is the propriety of the trial court's admission of evidence that Dr. Kabel had had other patients complain about his alleged representations involving Medicare. During his examination as an adverse witness by plaintiff's counsel, Dr. Kabel testified as follows:
 "A. . . . In a chiropractor's office, the patient, according to federal law, must pay for their examination. Now, if in the examination there is found to be a subluxation; that is, impingement of nerves, then, they will pay a limited amount on a limited number of manipulations. That's the federal law, so we sure wouldn't tell anybody Medicare would pay in our office.
"Q. You have never done that?
"A. Said that Medicare would pay?
"Q. Yes.
"A. No, sir.
 "Q. Have you ever had any complaints from anyone other than Mrs. Brady about that time about someone else being confused about your stating that Medicare would pay?
 "MR. HALSEY: We object, Your Honor. That's immaterial to the issues in this case.
"THE COURT: Overruled. You may answer.
 "THE WITNESS: There may have been one or two times. What happens is the person in their own mind, because they have this paid for in the M.D.'s office, they think it can be done in our office. They don't say anything about it, but later they pay us and later they come in and want us to fill out the form, but they are told more than once that Medicare does not pay.
"MR. TINNEY: (resumed): *Page 918 
 "Q. So, Mrs. Brady is not the only one who has had this confusion in your office about Medicare paying?
 "A. Well, I don't know of but one other one, maybe, and there wasn't any confusion there. I mean, her family was not confused. The lady was older, and sometimes people that can't hear well and are older misunderstand. Even I do that once in a while."
Later in the trial, the plaintiff addressed the same issue during cross-examination of Charlene Seymour:
 "Q. Now, when you were working there also, did you not have a lady named Mrs. Beasley, Mrs. Tinnie Beasley —
 "MR. HALSEY: We object to any testimony regarding a Mrs. Beasley, Your Honor.
 "MR. TINNEY: Judge, there's already been testimony from Dr. Kabel concerning another person having the same thing happen. That's already in evidence.
"THE COURT: Overruled. I'll allow it.
"MR. HALSEY: We except.
"MR. TINNEY: (resumed):
 "Q. Tell the Court what, if any, complaints Mrs. Beasley made.
 "MR. HALSEY: Now, we object to that. That calls for hearsay testimony.
"MR. TINNEY: Dr. Kabel testified —
 "MR. HALSEY: He hasn't testified concerning Mrs. Beasley. It's not in the record.
 "THE COURT: Sustained as to the form of the question.
"MR. TINNEY: (resumed):
 "Q. While you were there, did you receive any other complaints from people concerning representations which may have been made about Medicare payments?
 "MR. HALSEY: Now, we object on the same grounds, Your Honor. That calls for hearsay testimony. We have no idea where he's going. It has no relevance to this trial.
 "THE COURT: I'll allow her to answer the question just yes or no.
"THE WITNESS: Yes."
Dr. Kabel argues that this evidence is immaterial and irrelevant and that its admission into evidence constituted reversible error. We disagree.
While the doctrine of res inter alios acta generally operates to exclude as irrelevant any evidence of acts and declarations of nonparties, or dealings of parties with nonparties, its operation is limited in certain circumstances. Dorcal, Inc. v.Xerox Corp., 398 So.2d 665 (Ala. 1981); Loftin's Rent-All, Inc.v. Universal Petroleum Services, Inc., 344 So.2d 781
(Ala.Civ.App. 1977). Although past dealings of a party with a nonparty are normally excluded as irrelevant, this prior conduct becomes competent evidence when the intent of the party is in issue. Roberson v. Ammons, 477 So.2d 957 (Ala. 1985). In a fraud action, the "intent, knowledge and scienter constitute essential elements of the offense, [and] evidence of similar frauds and misrepresentations [is] commonly admissible."Dorcal, 398 So.2d at 671, citing Roan v. Smith, 272 Ala. 538,133 So.2d 224 (1961); Johnson v. Day, 230 Ala. 165, 160 So. 340
(1935); and 37 Am.Jur.2d Fraud Deceit § 456 (1968).
In Jackson v. Lowe, 48 Ala. App. 633, 266 So.2d 891 (1972), the Court of Civil Appeals was faced with such a situation. In that case, the trial court allowed the plaintiff, an unwitting purchaser of a stolen automobile, to call as a witness a man who had been similarly defrauded by the same seller. The court held that it was proper for the plaintiff to attempt to show a fraudulent scheme on the part of the seller by showing that others had had a similar experience with the seller. "The Alabama courts generally agree that evidence of other fraudulent transactions or deceit by the civil defendant is admissible to show fraud, motive, scheme or intent." C. Gamble,McElroy's Alabama Evidence, § 70.03(1) (3d ed. 1977).
Although the case sub judice presents a somewhat modified question, nevertheless, the testimony pertaining to the prior patient's confusion over Medicare was not inadmissible. Although it did not *Page 919 
establish that Dr. Kabel actually made any false
representations to that prior patient concerning eligibility of Medicare benefits, nevertheless, the evidence of the prior patient's confusion over Medicare was relevant as a similar occurrence. Indeed,
 "Great latitude is allowed in admitting evidence on the issue of alleged fraud. . . . Most often the perpetrator of fraud is the sole possessor of actual knowledge of such fraud. Undue restriction should not be placed on the introduction of evidence which has probative value, however slight, on this issue. Weight is for the jury. . . ."
(Citations omitted.) Mid-State Homes, Inc. v. Johnson, 294 Ala. 59,63, 311 So.2d 312, 315 (1975). Furthermore, "[q]uestions of materiality, relevancy, and remoteness rest largely with the trial judge, and his rulings must not be disturbed unless his discretion has been grossly abused." Ryan v. Acuff,435 So.2d 1244 (Ala. 1983). We hold that the trial court did not abuse its discretion.
 III.
Finally, Dr. Kabel contends that the jury's damages award was excessive and against the weight of the evidence. The jury returned a verdict against Dr. Kabel for $162,500. Since the verdict was in general form, we do not know what portion of the award would be compensatory damages. Although the complaint stated compensatory damages of only $609 (the cost of the physical examination), the record indicates that Mrs. Brady never received a refund of the $800.02 down payment on her hearing aids, nor the hearing aids themselves. Nevertheless, a large portion of this jury award should be recognized as punitive damages.
In Old Southern Life Ins. Co. v. Woodall, 295 Ala. 235,326 So.2d 726 (1976), this Court reviewed the propriety of imposing punitive damages in fraud actions:
 "Our cases have uniformly held that punitive damages may be awarded in actions for fraud, if there is evidence from which the jury can conclude that the fraud was malicious, oppressive, or gross, and the representations were made with knowledge of their falsity. Hall Motor Co. v. Furman, 285 Ala. 499, 234 So.2d 37 (1970); Boriss v. Edwards, 262 Ala. 172, 77 So.2d 909 (1954); Treadwell Ford, Inc. v. Leek, 272 Ala. 544, 133 So.2d 24 (1961); J. Truett Payne Co. v. Jackson, 281 Ala. 426, 203 So.2d 443 (1967). Moreover, '. . . The imposition of punitive damages in cases of fraud and deceit is discretionary with the jury, acting with regard to the enormity of the wrong and the necessity of preventing similar wrongs. . . .' Loch Ridge Construction Company, Inc. v. Barra, 291 Ala. 312, 320, 280 So.2d 745, 751 (1973)."
326 So.2d at 732.
The evidence presented in this case is in sharp conflict. Mrs. Brady testified that Dr. Kabel had misled her into believing that Medicare would pay for her treatment at the clinic and misrepresented to her that the physical examination would allow him to diagnose and treat her hearing problem. On the other hand, Dr. Kabel denies makingany statements to Mrs. Brady about Medicare and insists that the physical examination was totally separate from her hearing condition; he concedes that the tests he performed had nothing to do with her hearing loss. "When evidence is in conflict, the jury is free to believe or not to believe the witnesses."Roberson, 477 So.2d at 961, citing Carolina Casualty Ins. Co.v. Tisdale, 46 Ala. App. 50, 237 So.2d 855, cert. denied,286 Ala. 741, 237 So.2d 861 (1970). This Court generally will not disturb the decision of the jury on a fact question unless it is plainly erroneous or manifestly unjust. Allred v. Dobbs,280 Ala. 159, 190 So.2d 712 (1966).
Dr. Kabel asks this Court to reverse the trial court's denial of his post-judgment motions for a JNOV, a new trial, or a remittitur. For a party to be entitled to a JNOV, he must have moved for a directed verdict at the close of all of the evidence. Rule 50(b), A.R.Civ.P. If a party fails to move for a directed verdict at the proper time, his motion for JNOV will be denied. Perdue v. Gates, 403 So.2d 165 (Ala. 1981). The record in this case reveals that no *Page 920 
motion for directed verdict was made at the close of all of the evidence; therefore, the trial court's denial of the JNOV was proper.
A remittitur or a new trial should not be ordered on the grounds of excessiveness of the jury's verdict unless the court can determine that the verdict was reached on account of bias, passion, prejudice, corruption, or other improper motive. Mobile Dodge, Inc. v. Alford, 487 So.2d 866 (Ala. 1986). In accord with Hammond v. City of Gadsden,493 So.2d 1374 (Ala. 1986), the trial court properly stated and applied the factors to be considered in ruling on the defendant's post-judgment motions.
Let the judgment be affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, ALMON and HOUSTON, JJ., concur.