**BUCKMASTERS, LTD., Plaintiff,**

v.

**ACTION ARCHERY, INC. and Jeff Henderson, Defendants.**

Civ. No. 95 D–057–N.

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 30, 1996.

Richard H. Sforzini, Jr. and Dana C. Gibson, Montgomery, AL, for plaintiff.

Stephen B. Griffin and Julia C. Kimbrough, Birmingham, AL, for defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is defendants Action Archery, Inc. and Jeff Henderson's motion for summary judgment filed July 31, 1995. The plaintiff, Buckmasters, Ltd., responded in opposition on August 22, 1995. Also pending before the court is the plaintiff's motion for summary judgment, filed on August 1, 1995, to which the defendants responded in opposition on August 21, 1995. Because the motions involve similar issues and arise from the same set of facts, the court will address them simultaneously. After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court finds that the defendants' motion is due to be denied and that the plaintiff's motion is due to be granted.

## JURISDICTION AND VENUE

This court has subject-matter jurisdiction under the diversity jurisdiction statute, 28 U.S.C. § 1332, as there exists complete diversity between the parties and the amount in controversy exceeds $50,000. Personal jurisdiction and venue are uncontested.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)

(citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587; *see also Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511.

## FINDINGS OF FACT

Buckmasters is an Alabama Limited Partnership engaged in the promotion of the sport of bow hunting deer. Buckmasters offers memberships in its organization, which includes, but is not limited to, merchandise, magazine subscriptions and tournament bow competitions. It also offers a deer target system, which is licensed by Buckmasters and used by competitors to qualify for Buckmasters sanctioned tournaments.

In the fall of 1993, the defendant, Jeff Henderson ("Mr. Henderson"), contacted Buckmasters in response to an advertisement regarding a bow hunting camp, sponsored by Buckmasters. Dep. of Henderson at 15–16. Mr. Henderson telephoned Buckmasters and spoke with Mark Shoemaker, an employee of Buckmasters. *Id.* at 18. The conversation eventually led to a discussion about the Buckmasters Action Target System ("Target System").[1] *Id.* At Mr. Henderson's request, Rick Burley ("Mr. Burley") of Buckmasters sent him a "License and Security Agreement" regarding the licensing and the use of the Buckmasters marks and logos in connection with the purchase of the Target System. Dep. of Burley at 19–20.

After receiving the proposed contract (Pl.'s Ex. 1), Mr. Henderson called Mr. Burley and informed him that at the present time he could not afford to purchase the Target System. Dep. of Burley at 26. Mr. Henderson also stated that there were a number of clauses in the contract that he did not understand. Dep. of Henderson at 24–25. Therefore, at that time, Mr. Henderson chose to do nothing with the contract and simply filed it away. *Id.* at 24–25 & 31.

The next contact Mr. Henderson had with Buckmasters was at the Palmetto Sportsman Spring Classic ("Palmetto Classic") in Columbia, South Carolina in March, 1994. *Id.* at 32; Dep. of Burley at 28. Mr. Henderson went to the Palmetto Classic to view the Target System. Dep. of Henderson at 32. At the Palmetto Classic, Mr. Burley told Mr. Henderson about a Target System in New Jersey that might be available for sale at a reduced price. *Id.* at 33–34. Mr. Henderson also discussed with Mr. Burley the possibility of giving Mr. Henderson an exclusive 200–mile territory in connection with the pro-

---

1. The Target System is an electronic system that uses "pop-up" targets. It enables bow hunters to practice their shooting skills.

motion and use of the Target System. *Id.* at 35. Mr. Burley got Mr. Henderson's telephone number and told Mr. Henderson that he would contact him. *Id.* at 34; Dep. of Burley at 28.

Sometime thereafter, Mr. Burley telephoned Mr. Henderson and explained that John Montefusco, Sr.'s son, who lived in New Jersey, was dying of cancer and that Mr. Montefusco wanted to sell his Target System. Dep. of Burley at 28–29. Mr. Burley gave Mr. Montefusco the telephone number of Mr. Henderson, and several weeks later, Mr. Montefusco called Mr. Henderson to discuss the Target System. Dep. of Henderson at 34.

After Mr. Henderson had spoken with Mr. Montefusco, he contacted Mr. Burley and told him that he was ready to go forward with the contract. Dep. of Burley at 33–34. At this point, Buckmasters generated another copy of the "License and Security Agreement." Pl.'s Ex. 2. The differences between the first contract sent to Mr. Henderson and this second contract were that the security agreement in the contract had been deleted in the second one and the territory was increased to a 200–mile radius from a 50–mile radius. Pl.'s Ex. 1 & 2. All of these changes were done at the request of Mr. Henderson. Dep. of Burley at 34. Mr. Burley's supervisor, Lewis Figh ("Mr. Figh"),[2] gave Mr. Burley permission to make these changes. *Id.* at 34–36.

Mr. Henderson received the second proposed contract in April, 1994. Dep. of Henderson at 37–38. He hired an attorney, Susan Davis, to look over the document. *Id.* at 37–38. The second contract stated that Mr. Henderson was the licensee. Pl.'s Ex. 2. Mr. Henderson, however, had told Mr. Burley that the contract was to be in the name of Action Archery, Inc., a company that Mr. Henderson was forming, as the Licensee. Dep. of Henderson at 46–47. Mr. Henderson also pointed out to Mr. Burley that he did not like the language of ¶ 2(i) of the second contract, which was the provision granting Mr. Henderson an exclusive 200–mile territo-

ry for a period of two years. Dep. of Burley at 38. Mr. Henderson and his attorney then made changes to the document that were discussed with Mr. Burley. Dep. of Henderson at 47–48; Pl.'s Ex. 3.

In addition to these changes, the new contract ("third proposed contract") prepared by Mr. Henderson also contained a change in ¶ 2(f). Paragraph 2(f) of the third contract states as follows:

> f. Memberships in Buckmasters. In further consideration for the rights and privileges granted in connection with use of the Marks, Licensee shall make available to all individuals who use the Target, whether in connection with a Tournament or otherwise, Membership in Buckmasters and shall provide any Nonmembers of the opportunity to renew or purchase Membership for an amount equal to the cost thereof then being charged by Buckmasters. Buckmasters shall credit thirty-five percent (35%) of the cost of each Buckmasters membership or renewal sold by Licensee against the License Fee owed to Buckmasters by Licensee under Section 3 hereinbelow. Licensee shall utilize Membership forms and information supplied by Buckmasters and shall submit all information relating Memberships and renewals to Buckmasters as part of monthly reports and Buckmasters shall likewise report to Licensee on a monthly basis as to credits and pay directly to Licensee any amounts in excess of annual fee on a monthly basis. Buckmasters shall, on a monthly basis, supply Licensee with an accounting listing the names and addresses of those Members who have purchased their Memberships though [sic] Licensee. **(Licensee shall earn credit as stated for any and all Memberships and/or renewals of persons located within territory of Licensee.)**[3] In addition, upon the written request of the Licensee, Buckmasters will provide a list of Members, by zip code, residing in Licensee's territory for use in the marketing of the Club. It being explicitly acknowledged that Membership is

---

2. Mr. Figh is the President of Buckmasters.

3. The parentheticals around the sentence "Licensee shall earn credit as stated. . . ." were handwritten.

not a prerequisite to use of the Target other than during qualifying tournaments.

Pl.'s Ex. 3 (emphasis and footnote added).

After receiving the third proposed contract, Mr. Burley telephoned Mr. Henderson. Aff. of Burley. Mr. Henderson discussed this addition to ¶ 2(f) and, according to Mr. Burley, told Mr. Burley that the language in the parentheticals was only added to ensure that Mr. Henderson would get credit for memberships or renewals sold by his employees. *Id.* Specifically, Mr. Burley contends that Mr. Henderson mentioned that he may have some teenagers working for him and that the intent behind the language in the parentheticals was to ensure he would get proper credit for any memberships or renewals sold by these teenagers under his employment. *Id.* However, in regards to the language in the parentheticals, Mr. Henderson testified at his deposition that his intent all along was for this language to mean that he was to receive credit for all memberships and renewals in his territory whether he sold them or not.[4] Dep. of Henderson at 64. In any event, Mr. Burley discussed his conversation with Mr. Henderson and the language of ¶ 2(f) with Mr. Figh. Relying upon what Mr. Burley contends Mr. Henderson told him about the purpose of the change in ¶ 2(f) and, thus, realizing that the change would not affect the compensation of Mr. Henderson or Action Archery as Licensee under the contract, Mr. Figh gave Mr. Burley his approval for those changes.

At this stage in the negotiations, Mr. Henderson also sought from Buckmasters twelve positions in the Southern Qualifying Tournament.[5] Specifically, Mr. Henderson sought to secure spots in the Qualifying Tournament for bow hunters that he sponsored. Dep. of Burley at 40. Mr. Burley again spoke with Mr. Figh about Mr. Henderson's request. Mr. Figh told Mr. Burley that approval for such a request would have to come from Jackie Bushman ("Mr. Bushman").[6] *Id.* at 40. Sometime during the spring of 1994, Mr. Bushman spoke with Mr. Henderson on the telephone and approved Mr. Henderson's request to reserve spots for his shooters in the Southern Qualifying Tournament.[7] Dep. of Bushman at 16. However, Mr. Henderson does not remember speaking with Mr. Bushman. Dep. of Henderson at 58. During this same conversation, Mr. Bushman also discussed with Mr. Henderson the concept behind the Licensing Agreement. Aff. of Bushman. Specifically, Mr. Bushman told Mr. Henderson that the purpose of the contract was to give Mr. Henderson thirty-five percent credit for all memberships or renewals sold by him. *Id.* Mr. Bushman explained that the money earned from the membership or renewals sold by Mr. Henderson would be credited towards the Licensing fee.[8] *Id.* The conversation between Mr. Bushman and Mr. Henderson lasted about fifteen to twenty minutes. Dep. of Burley at 41. After these conversations, Mr. Henderson made the modifications in ¶ 2(i) that were discussed, signed the contract and sent it back to Buckmasters (referred to as the fourth contract).[9] Dep. of Henderson at 74; Pl.'s Ex. 4.

4. Mr. Henderson does not recall whether he informed Buckmasters of his intent. Dep. of Henderson at 65–67.

5. The Southern Qualifying Tournament was a tournament in which bow hunters would compete with each other in an effort to qualify for the national tournament.

6. Mr. Bushman is the CEO of Buckmasters.

7. Specifically, Buckmasters reserved twelve positions in the tournament for Mr. Henderson—6 male and 6 female positions.

8. The Licensing Fee is defined in ¶ 3 of the contract as follows:

(i) Annual License Fee. In consideration of the rights and licenses granted hereunder Licensee [sic] shall pay to Buckmasters, a License Fee equal to $2,000.00 per annum, which shall be payable to Licensee to Buckmasters, the first installment of which shall be due on the first day of the third Contract Year with subsequent installments due and payable on the first of each succeeding Contract Year so long as this Agreement remains in effect.

9. Paragraph 2(i) was the section of the contract concerning the 200–mile exclusive territory and also the qualifying positions. In the third proposed contract, ¶ 2(i) stated:
  i. Buckmasters hereby grants to Action Archery, Inc. the exclusive rights to the terms and conditions of this Agreement in a radius of 200 miles of

Between the third and fourth contracts, there were no changes made in ¶ 2(f). Dep. of Burley at 80; Pl.'s Ex. 3 & 4. Upon receiving the fourth contract, Mr. Burley gave the contract to Mr. Figh for his review. Mr. Figh read ¶ 2(i) and did not like its wording. Therefore, he crossed out the phrase "exercise of the rights granted hereby" and substituted the word "purchase" in its place. Mr. Figh also crossed out the word "current" in the paragraph. He then initialed the change, signed the contract and gave it back to Mr. Burley.[10] Dep. of Figh at 37. Mr. Burley telephoned Mr. Henderson and told him about the change Mr. Figh had made in ¶ 2(i). He also told Mr. Henderson that Mr. Figh had initialed the change. Dep. of Burley at 62. Mr. Burley told Mr. Henderson that all Mr. Henderson had to do was to initial that one change in the fourth contract and then they had a "done deal." *Id.* at 62. Mr. Henderson, in response, stated that he would just make the change, rather than initial it, and then send the contract back to Buckmasters. Dep. of Figh at 37.

Mr. Henderson, however, did not make just that one change to ¶ 2(i) as discussed.[11] Mr. Henderson also deleted the words "sold by Licensee" in ¶ 2(f). Dep. of Henderson at 105. Mr. Henderson did not inform Buckmasters of this significant change. He deleted those words, signed the fifth proposed contract and mailed it back to Buckmasters without telling Buckmasters about the deleted words in ¶ 2(f). *Id.* at 105.

Upon receipt of the fifth proposed contract, Mr. Burley telephoned Mr. Henderson

and discussed ¶ 2(i). Mr. Henderson, again, did not mention that he had deleted the words "sold by Licensee" in ¶ 2(f). Dep. of Burley at 87. Based upon this telephone conversation and believing that no other changes had been made in the contract except for those discussed, Mr. Burley took the document to Mr. Figh. Mr. Burley pointed out the change that had been made in ¶ 2(i) and left the document with Mr. Figh. *Id.* at 64 & 88. Mr. Figh, also believing that the change that the parties had discussed in ¶ 2(i) had been the only change made in the contract, read the change, decided that the change was satisfactory and signed the document. Dep. of Figh at 15–16 & 38.

Neither Mr. Figh nor Mr. Burley knew the phrase "sold by Licensee" had been deleted in ¶ 2(f) by Mr. Henderson. Dep. of Figh at 36; Dep. of Burley at 88. This change was not negotiated nor was it agreed upon by the parties. Dep. of Figh at 24. In fact, had this change been brought to the attention of Buckmasters, Mr. Figh would have never signed the contract. *Id.* at 36.

The next contact with Mr. Henderson came when Mr. Henderson called Mr. Burley in late June of 1994 and told him that he had acquired the Target System from Mr. Montefusco. Dep. of Burley at 70. Mr. Burley then sent Mr. Henderson two separate lists containing the names of members of Buckmasters in Mr. Henderson's territory to be used for marketing purposes. One list contained mailing labels for the state of South Carolina containing over 7,000 names. Dep. of Henderson at 173. The other list was on a computer disk and contained over 28,000

---

Chapin, SC for the license period and automatically renewed for an additional time period at Licensee's option. Licensee shall be allowed to purchase additional Targets at the current market rate at the time of exercise of the rights granted hereby.
Pl.'s Ex. 3.
Mr. Henderson then revised this paragraph to state as follows:
i. Buckmasters hereby grants to Action Archery, Inc. the exclusive rights to the terms and conditions of this Agreement in a radius of 200 miles of Chapin, SC for the ten (10) year license period. Licensee shall be allowed to purchase additional Targets at the current market rate at the time of exercise of the rights granted thereby. Additionally, as part of the

exclusive rights granted to Action Archery, Inc., Buckmasters grants 12 positions six (6) men and six (6) women for 1995 Southern Qualifying Tournament and continues same or additional numbers of positions for insuring Qualifying Tournaments for the terms of the License.
Pl.'s Ex. 4.

**10.** At this point, both parties had signed the contract. Pl.'s Ex. 4.

**11.** Mr. Henderson corrected a misspelled word in ¶ 2(i) and initialed it. The correction changed the word "insuring" to "ensuing." Dep. of Henderson at 79; Pl.'s Ex. 4.

names of Buckmasters' members in Mr. Henderson's territory. Dep. of Burley at 70–75; Dep. of Henderson at 175.

After that, Buckmasters had no further communications with Mr. Henderson until Mr. Burley received a letter from Mr. Henderson's attorney. Mr. Figh told Mr. Burley to telephone Mr. Henderson to discuss with Mr. Henderson the problems that he was having. Dep. of Burley at 82; Dep. of Figh at 42. Mr. Burley telephoned Mr. Henderson but was abruptly cut-off by Mr. Henderson who told Mr. Burley that Mr. Burley needed to talk with Mr. Henderson's attorney, Susan Davis. Dep. of Burley at 82; Dep. of Figh at 42.

During this time, Mr. Henderson had discussions in either July or August of 1994 with Larry Cartee, who works for the South Carolina Department of Wildlife, about demonstrating Mr. Henderson's Target System at the Palmetto Classic in March, 1995. Dep. of Henderson at 196–97. Mr. Cartee agreed in September or October of 1994 to allow Mr. Henderson to demonstrate the Target System at the Palmetto Classic. *Id.* at 197. In March, 1995, Mr. Cartee told Mr. Henderson that he understood that Mr. Henderson was in a dispute with Buckmasters. Mr. Cartee explained to Mr. Henderson that he had been told by Alan Brewer, a Buckmasters employee, at a convention in Las Vegas in January of 1995, that a dispute had arisen between the parties. Dep. of Henderson at 200 & 244–45. As a result, Mr. Cartee stated that due to the dispute, Action Archery in conjunction with the Buckmasters name, logo or marks could no longer be used in any advertisements for the Palmetto Classic. *Id.* At this point, Mr. Figh contacted Mr. Cartee to discuss the situation between Buckmasters and Mr. Henderson. Mr. Figh explained to Mr. Cartee that Buckmasters was in a dispute with Mr. Henderson and Action Archery but that Mr. Figh needed to first check with Buckmasters' attorneys before he could tell Mr. Cartee whether or not Mr. Henderson could use the name or logo of Buckmasters. Dep. of Figh at 22. Mr. Figh did not advise Mr. Cartee that Mr. Henderson could not use the Buckmasters name or logo. *Id.* In fact,

after that conversation, Mr. Cartee allowed Action Archery and Jeff Henderson to use Buckmasters' logo and name for promotion at the Palmetto Classic in March of 1995. *Id.* at 23.

## DISCUSSION

### A. *Rule 9(b) of the Federal Rules of Civil Procedure*

The defendants first contend that they are entitled to summary judgment because Buckmasters has failed to state with "particularity" the circumstances constituting fraud. Specifically, the defendants assert that Buckmasters has failed to properly plead the time, place and contents of the alleged false representation made by Mr. Henderson to Buckmasters.

■ Rule 9(b) of the *Federal Rules of Civil Procedure* provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." However, this does not require every element to be stated with particularity, but rather the "pleader must use more than generalized or conclusory statements setting out the fraud. The pleader must state the time, the place, the contents or substance of the false representations, the fact misrepresented, and an identification of what has been obtained." *Mays v. United Ins. Co. of America,* 853 F.Supp. 1386, 1389 (M.D.Ala.1994) (citing *Robinson v. Allstate Ins. Co.,* 399 So.2d 288, 290 (Ala.1981)). Moreover, "Rule 9(b) does not require that the complaint explain the plaintiff's theory of the case, but only that it state the misrepresentation, omission, or other action or inaction that the plaintiff claims is fraudulent." *Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 523 (7th Cir.1993) (citations omitted).

■ The purpose of Rule 9(b) is to provide fair notice of the alleged fraud to the opposing party. *Kabel v. Brady,* 519 So.2d 912 (Ala.1987). Given the notification purpose behind Rule 9(b), the court finds that any confusion as to what Buckmasters was claiming as fraud has since been clarified by Buckmasters' motion for summary judgment. Moreover, the court finds persuasive the fact

that the defendants never challenged the sufficiency of the pleadings in a Rule 12(b)(6) motion for failure to state a claim, nor did the defendants move for a more definite statement under Rule 12(e). *See* Fed. R.Civ.P. 12(b)(6) & 12(e). Based on the foregoing, the court finds that Buckmasters has provided the defendants with sufficient notice of the alleged fraud as required under Rule 9(b). Accordingly, the defendants' motion for summary judgment alleging that Buckmasters failed to plead the alleged fraud with sufficient particularity is due to be denied.

### B. *Rescission of the Contract*

**1. *Availability of Rescission or Reformation***

■ In its motion for summary judgment, Buckmasters seeks a rescission of the contract or, in the alternative, the reformation of the contract. In response, the defendants contend that the affidavits presented in support of Buckmasters' motion for summary judgment are "shams," and therefore should be disregarded by the court. In addition, in their motion for summary judgment, the defendants contend that Buckmasters is not entitled to rescission of the contract because it was negligent in its execution of the contract when it failed to read the contract cover to cover. Specifically, the defendants contend rescission is inappropriate because neither Mr. Burley, Mr. Figh nor any Buckmasters employee read the contract in its entirety. Thus, before deciding whether rescission or reformation is appropriate, the court will address whether it will consider the affidavits presented by Buckmasters and whether the alleged unilateral mistake by Buckmasters bars rescission.[12]

In *Van T. Junkins & Assocs. v. United States Indus., Inc.*, 736 F.2d 656 (11th Cir.

1984), the Eleventh Circuit held that in opposing a motion for summary judgment, a party cannot create a genuine issue of material fact by submitting "an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.* at 657. Hence, a court properly may disregard such an affidavit as unreliable and a sham. *Id.* at 658. However, the court notes that, after numerous readings of the relevant affidavits and depositions, it is unable to find support for the defendants' assertion that contradictions exist between the affidavits and the depositions. Therefore, the court finds that this contention is without merit, and the affidavits will be considered in the court's analysis of Buckmasters' motion for summary judgment.

■ Under Alabama law, equity will not reform or rescind a contract if the party seeking reformation or rescission has been guilty of "culpable and injurious negligence." *Ex parte Metropolitan Life Ins. Co.*, 266 Ala. 551, 98 So.2d 20, 28 (1957) (quoting *Gralapp v. Hill*, 205 Ala. 569, 88 So. 665 (1921)); *see also Great Atlantic & Pacific Tea Co. v. Engel Realty Co.*, 241 Ala. 236, 2 So.2d 425, 427 (1941); *Ex Parte Perusini Const. Co.*, 242 Ala. 632, 7 So.2d 576, 578 (1942). Thus, mere negligence is not a defense to a complaint to reform or rescind an instrument. *Id.* Moreover, the Supreme Court of the United States has recognized the right to reform or rescind a contract under the situation presented here:

> Where the parties to a contract have reached an agreement on its terms and one of them has undertaken to reduce the contract to writing or to prepare a writing which embodies the agreement, the other party is ordinarily entitled to assume that

**12.** The court notes that the defendants imply in their motion for summary judgment that the parol evidence rule is applicable, and thus, Buckmasters is barred from presenting evidence of the negotiating process. "The general rule of contract law is that, if a written contract exists, the rights of the parties are controlled by that contract, and parol evidence is not admissible to contradict, vary, add to, or subtract from its terms." *Clark v. Albertville Nursing Home, Inc.*, 545 So.2d 9, 11 (Ala.1989). However, the parol evidence rule allows the "introduction of extrinsic evidence in the event of fraud, mistake, or ambiguity." *Rime–Shatten Dev. Co. v. Birmingham Cable Communications, Inc.*, 569 So.2d 332, 334 (Ala.1990) (citing *League v. Giffin*, 347 So.2d 1332 (Ala.1977); *see also Ford Motor Co. v. Neese*, 572 So.2d 1255, 1257–58 (Ala.1990). It is clear to the court that Buckmasters has presented sufficient evidence of both fraud in the procurement of the contract and ambiguity in the contract. As a result, the court finds that the parol evidence rule is not applicable.

the written instrument is correct, and is not barred from reformation by signing or accepting it without reading it.

66 Am.Jur.2d *Reformation of Instruments* § 83 at 608 (citing *Elliott v. Sackett*, 108 U.S. 132, 2 S.Ct. 375, 27 L.Ed. 678 (1883)). Furthermore,

> it is established that a contract executed or modified by one party in reliance upon material false representations as to the contents of such last writing is void in toto at the election of the one so fraudulently induced or misled to his prejudice, although the latter neglected to read that writing (when he could read and had an opportunity to do so). . . .

*Standard Oil Co. v. Myers*, 232 Ala. 662, 169 So. 312, 314 (1936).

■ Here, after Buckmasters and Mr. Henderson signed the proposed fourth contract and before receipt of the proposed fifth contract by Buckmasters, Mr. Burley told Mr. Henderson that Buckmasters had made a change in ¶ 2(i) in the proposed fourth contract and that all Mr. Henderson had to do was initial the change and they had a "done deal." Mr. Henderson replied that, instead of initialing the change, he would just make the correction and send back another contract. At that point, the court finds that Buckmasters believed the parties had reached an agreement. However, as indicative of his later actions, Mr. Henderson still desired additional alterations of the proposed contract. Mr. Henderson took it upon himself to reduce that agreement to writing. Thus, the court finds that Buckmasters was entitled to assume that the contract which Mr. Henderson sent back was correct and accurately reflected the parties' agreement. In fact, when Buckmasters received the fifth proposed contract, Mr. Figh read and reviewed the change discussed in ¶ 2(i). He did not read ¶ 2(f) because there was never any discussion regarding further changes to ¶ 2(f).

In addition, the court finds that Buckmasters was lulled into a sense of security through the false representation of Mr. Henderson that he would just make the change to ¶ 2(i) and send the proposed contract to Buckmasters. As such, the law imputes to Buckmasters no knowledge of the contents of the contract. *See Valley Properties, Inc. v. Strahan*, 565 So.2d 571, 581 (Ala.1990). The court is convinced that Mr. Henderson should have told Buckmasters that he deleted the phrase "sold by Licensee" in the proposed fifth contract, especially where such a material change had not been discussed between the parties and also where he knew such a change would be easy to miss. *See* Dep. of Henderson at 118–19. Based on the foregoing, the court finds that Buckmasters is not barred from reformation or rescission of the contract and the defendants' motion for summary judgment asserting such is due to be denied.

### 2. Rescission

■ The court finds that the contract should be rescinded because of fraud perpetrated by the defendants. The Supreme Court of Alabama has recognized that "it is a fundamental principle of law that inadequacy of consideration is not, by itself a sufficient ground to set aside a contract. . . ." *Williamson v. Matthews*, 379 So.2d 1245, 1246 (Ala.1980). As such, the court has recognized for over 144 years that:

> There must be something else besides the mere inadequacy of consideration or inequality in the bargain, to justify a court in granting relief by setting aside the contract. What this something else besides the inadequacy should be, perhaps no court ought to say, lest the wary and cunning, by employing other means than those named, should escape with their fraudulent gains. [H]owever, . . . it ought, in connection with the inadequacy of consideration, to superinduce the belief that there had been either a suppression of the truth, the suggestion of falsehood, abuse of confidence, a violation of duty arising out of some fiduciary relation between the parties, the exercise of undue influence, or the taking of an unjust and inequitable advantage of one whose peculiar situation at the time would be calculated to render him an easy prey to the cunning and the artful. But if no one of these appears, or if no fact is proved that will lead the mind to the conclusion, that the party against whom relief is sought has suppressed some fact

that he ought to have disclosed, or that he has suggested some falsehood, or abused in some manner the confidence reposed in him, or that some fiduciary relation existed between the parties, or that the party complaining was under his influence, or at the time of the trade was in a condition, [f]rom any cause, that would render him an easy victim to the unconscientious, then relief cannot be afforded. . . .

*Id.* at 1246–47 (quoting *Judge v. Wilkins,* 19 Ala. 765, 772 (1851)).

Here, the court finds that there is unrefuted evidence indicating not only the suppression of the truth but also the suggestion of falsehood, abuse of confidence, a violation of duty arising out of some fiduciary relation between the parties, the exercise of undue influence, and the taking of an unjust and inequitable advantage of one whose peculiar situation at the time would be calculated to render him or her an easy prey to the cunning and the artful. Mr. Henderson recognized that Buckmasters signed the proposed fourth contract with the words "sold by Licensee" in ¶ 2(f).[13] Thereafter, Mr. Henderson discussed with Buckmasters changes in ¶ 2(i). An agreement was reached concerning the changes in ¶ 2(i) and Buckmasters initialed the changes in its copy. Mr. Henderson told Buckmasters that he would make the change in ¶ 2(i) and send the contract back to Buckmasters. Dep. of Figh at 37. At this time, relying on the representations of Mr. Henderson that only ¶ 2(i) would be changed, Buckmasters believed an agreement had been reached. However, Mr. Henderson also deleted the phrase "sold by Licensee" in ¶ 2(f). Even though this deletion would be easy to miss because it was in the middle of a single-spaced paragraph, he failed to inform Buckmasters of the change in ¶ 2(f). In fact, he never told Buckmasters that his intention was to receive credit for all memberships within his territory regardless of who sold them.[14] Moreover, he had the opportunity to inform Buckmasters of this intention and the change in ¶ 2(f). Because of this fraud, the contract fails to express the intention of both of the parties.

■ In addition, the inadequacy of consideration in a contract may be evidence of fraud.[15] *Ray v. Brewer,* 257 Ala. 253, 58 So.2d 785 (1952) ("[W]ant of consideration may be a badge of fraud."). In light of this principle, the court finds that the economic impact of the parties' varying interpretations of the contract provides further support of fraud.

At the time of entering the contract, Mr. Henderson was obligated to pay Buckmasters a $2,000 Licensing Fee each year for the use of its name and logo, with the payment of the fee deferred until the third year of the contract. Pl.'s Ex. 5 at ¶ 3(i). Prior to the deletion of the clause "sold by Licensee," ¶ 2(f) provided that Mr. Henderson or Action Archery as Licensee would receive thirty-five percent credit for the memberships and renewals sold by him. Pl.'s Ex. 1–4 at ¶ 2(f).

**13.** It is undisputed that Buckmasters believed that ¶ 2(f) would allow Mr. Henderson to receive credit for memberships or renewals which Mr. Henderson sold. It is also undisputed that, otherwise, Buckmasters would not have signed the contract.

**14.** In discussions concerning the third proposed contract, Buckmasters contends that Mr. Henderson represented to Buckmasters that his intention behind ¶ 2(f) was to receive credit for memberships or renewals sold by employees of Action Archery. Mr. Henderson cannot recall this conversation. In any event, Mr. Henderson admits he never told Buckmasters that his intent was to receive credit for all memberships or renewals sold within his territory, regardless of who sold them.

**15.** In general,

[t]he rule is clear that inadequacy of the consideration is not, in itself, a sufficient ground for cancellation of any agreement or instrument, including a deed. But in *determining* whether an instrument should be canceled, inadequacy of the consideration is a factor to be considered in connection with the presence of other inequitable features of the case. And where the consideration is grossly inadequate, equity will lay hold of slight circumstances of fraud ... in granting relief by way of cancellation.

13 Am.Jur.2d *Cancellation of Instruments* § 25 at 518–19; *see also* 17A C.J.S. *Contracts* § 419 at 514–15 ("[W]here inadequacy of consideration is so gross as to shock the conscience, or is so connected with suspicious circumstances or misrepresentations as to afford, if not conclusive, evidence of fraud, it may furnish ground for relief" from the contract.).

Since a Buckmasters' membership cost twenty dollars, if Mr. Henderson sold a membership, Action Archery would receive seven dollars in return. The seven dollars would be credited against the Licensing Fee charged by Buckmasters for the use of its name and logo in connection with the Target System. *Id.* Thus, under the prior versions of the contract, for every membership sold by Action Archery, seven dollars would be credited against the $2,000 Licensing Fee.

After Mr. Henderson deleted the phrase "sold by Licensee," however, ¶ 2(f) appeared to give him credit for every membership or renewal sold within his territory. Within Mr. Henderson's 200 mile territory is over 28,000 members of Buckmasters. Dep. of Burley at 70–75. In other words, if 10,000 of the 28,000 members of Buckmasters within Mr. Henderson's territory renewed their memberships each year, Mr. Henderson would receive a seven dollar credit whether he sold the renewal or not. That means that Mr. Henderson could possibly earn $70,000 per year (10,000 × $7.00). Since the contract is for ten years, Mr. Henderson could possibly receive $700,000 even though Buckmasters in return would only be entitled to receive $16,000 ($2,000 × 8 yrs) from Mr. Henderson in Licensing Fees. Furthermore, Mr. Henderson would be entitled to this money whether he sold the memberships or not. In fact, if the contract is left to stand according to Mr. Henderson's modification of ¶ 2(f), he could do nothing and still receive credit for every membership or renewal within his territory. It is abundantly clear to the court that deletion of the phrase "sold by Licensee" is a significant and material change, which impacts the entire economic effect of the contract.

The court finds it noteworthy to mention that during the thirteen months since signing the contract, there have been approximately 11,000 people to join Buckmasters either through new memberships or renewals within Mr. Henderson's territory. Aff. of Figh. However, during that same time, Mr.

Henderson has sold only about six or seven memberships or renewals. Dep. of Henderson at 133–68. Yet, Mr. Henderson still asserts that he is entitled to receive thirty-five percent credit for those 11,000 members, even though he has only been responsible for six or seven of them. Based on the foregoing, the court finds that this want of consideration under the contract is further evidence that Buckmasters was induced into signing the contract by fraud perpetrated by the defendants.

The court believes that rescission, rather than reformation, is appropriate in this instance because there was no agreement.[16] For instance, the requisite elements of a valid contract include "an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract." *Strength v. Alabama Dep't of Finance,* 622 So.2d 1283, 1289 (Ala.1993). Moreover, it is a fundamental principle of contract law that there must be a "meeting of the minds" as to all the elements of a contract. *Christian v. Rabren,* 290 Ala. 45, 273 So.2d 459 (1973). Here, the court finds that the parties never had a "meeting of the minds," which is essential to a valid, enforceable contract.

From the beginning, Mr. Henderson's intention was to receive credit for any and all memberships or renewals sold within his territory, regardless of whether he sold them. Dep. of Henderson at 40–41. He explained in his deposition that he sought to obtain credit for all memberships in his territory because there was no way to determine whether a membership or a renewal within his territory was generated by him. *Id.* Hence, the reason he changed ¶ 2(f) was to insure he received credit for anyone who bought a membership or renewal in his territory. However, Mr. Henderson never expressed this intention to Buckmasters.[17] *Id.* at 40–44. On the other hand, Mr. Bushman stated that it was Buckmasters intent for Mr. Henderson only to receive credit for memberships or renewals that Mr. Henderson sold as Licensee under the contract. Aff. of

---

16. On the other hand, reformation implies an agreement between the parties—i.e., the contract is reformed to the parties original intent.

17. Specifically, Mr. Henderson does not recall telling Buckmasters his intention. In addition, Buckmasters states that they were never told Mr. Henderson's intention.

Bushman. As a result, the court finds that the parties never reached "a meeting of the minds" as to the compensation of the Licensee under ¶ 2(f) of the contract.[18]

## CONCLUSION

For the foregoing reasons, the court finds that the contract between the parties should be rescinded. As such, Buckmasters is entitled to summary judgment on Count I of its complaint. Furthermore, the rescission of the contract entitles Buckmasters to summary judgment on the defendants' counterclaim since each count of the counterclaim is grounded on the assumption that there exists a valid and enforceable contract between the parties.[19]

Accordingly, it is CONSIDERED and ORDERED that defendants Action Archery, Inc. and Jeff Henderson's motion for summary judgment be and the same is hereby DENIED.

It is further CONSIDERED and ORDERED that plaintiff Buckmasters, Ltd.'s motion for summary judgment be and the same is hereby GRANTED.

---

**18.** Although not discussed, the court notes that the extreme ambiguity of the contract coupled with the failure of "a meeting of the minds" provides independent support for rescission.

**19.** Specifically, the counterclaim alleges that Buckmasters has breached the contract of the parties.