ON REHEARING EX MERO MOTU
This action arose out of the plaintiff's discharge from his position as Integon Life Insurance Company's regional general agent in Florence, Alabama. The complaint alleged fraud, breach of contract, and wrongful discharge against Integon and tortious interference with Hall's contract with Integon against Donald Brackin and Harold Barber. The trial court granted summary judgment in favor of all defendants. The plaintiff, Lilbourne Hall, appeals as to Integon Life Insurance Company and Donald Brackin. We affirm in part and reverse in part.
The following counts are germane to this appeal:
 COUNT 1 for breach of contract, alleging that under the terms of their contract Hall was entitled to be Integon's exclusive general agent in the Florence area and that Integon had breached the agreement by appointing another general agent in the area;
 COUNT 2 for fraud, alleging that Integon fraudulently induced him into entering into a contract to act as its general agent in the Florence area by falsely representing to him that he would have an exclusive agency in the Florence area;
 COUNT 3 for breach of contract, alleging that after their written contract was executed the parties orally agreed to modify the contract to provide that Hall *Page 1340 
would not be terminated unless he was guilty of gross misconduct;
 COUNT 4 for breach of contract, claiming money allegedly due under the terms of the parties' agreement;
 COUNT 5 for tortious interference with a contractual relationship, against Donald Brackin.
 COUNTS 6 and 7 for wrongful discharge, alleging that his termination was willful and malicious, contrary to the public interest and in violation of an implied covenant of good faith and fair dealing; and
 COUNT 8 for fraud, alleging that Integon fraudulently misrepresented to him that he would not be terminated except for gross misconduct.
 COUNT I: Breach of Exclusive Agency Contract
Prior to becoming associated with Integon, Hall was the exclusive agent in the Florence area for the Jackson Life Insurance Company. In 1974, Integon acquired the Jackson Company and began negotiations with Jackson's agents regarding their joining the Integon sales force. Several meetings took place between the Jackson agents and Integon representatives. Hall claims that at one of the meetings John Penry, Integon's vice-president, assured Hall and the other Jackson agents that "all of the benefits from the Jackson contract" would accrue to the agents under Integon's contract. A meeting took place at Integon's office in North Carolina, where Hall met with Penry, with Integon's president, and with its sales director. At the meeting the parties discussed specific changes in Integon's standard agent's contract that would be necessary in order to induce Hall to enter into an agreement to represent Integon.
After the meeting in North Carolina, Hall sent Penry a letter dated October 21, 1974, stating, inter alia:
"Dear John:
 "Thank you very much for the kind hospitality extended to me and Tom Hodges and Ozell Hinkle on Thursday and Friday of last week. Please express our thanks and appreciation to the other delightful people we met during our brief visit with you.
"John, I enclose herewith the following items:
 "1. A list of amendments to be attached to my General Agent's contract and to my Agent's Contract.
 "2. A list of three items that cause great concern on the part of myself and Tom Hodges in particular. Mr. Hinkle appears less concerned about these three items than Tom and myself.
 "3. A list of questions still remaining unanswered in regard to some of the problems we are facing in transferring our affiliation from Jackson Life to Integon.
 "During my conference with the Integon president, Mr. Ed Collette, he assured me that he and the company would honor any commitments that you make to me in writing. This is, of course, as I expected it to be. I, therefore, respectfully request your signature on the ten listed amendments to be attached to my agent's contract and my general agent's contract. A postage-free envelope is enclosed for your use in returning this list of amendments to me at your earliest convenience."
Three enclosures were included with the letter. Each enclosure corresponded to one of the three items listed in the body of the letter. Enclosure number one drafted by Hall was in the form of a letter from Penry to Hall. It was addressed to Hall and contained a place at its foot for Penry to sign. The document was dated November 1, 1974, and its introductory paragraph stated:
 "I hereby approve the following amendments to be added to your General Agent's Contract and your Agent's Contract with the Integon Life Insurance Company of Winston-Salem, North Carolina, which contracts are dated November 1, 1974." *Page 1341 
It then listed ten separately numbered "amendments," including:
"Amendment No. 6
 "Integon agrees that those areas which are within the managerial responsibilities of the company's managers and general agents shall remain the exclusive territory of such present managers and/or general agents; and no other managers or general agents with the company will establish offices or hire agents in those areas. In areas where there is overlapping responsibility at the present time, both present managers and general agents may continue to hire new personnel."
Penry replied by way of a letter dated October 31, 1974, that "The amendment requested by you has been prepared and will become part of your contract dated November 1." Penry refused to agree to one of the "amendments," namely "amendment 8," stating that, in his opinion, it was not necessary. Enclosed with Penry's letter was a document in the same form as Hall's enclosure number one, stating, inter alia:
"Amendment 6
 "Integon agrees that for purposes of solicitation of life and health insurance, that it will not appoint agents under its Agency or Branch Office Department in Scottsboro or Cullman, Alabama unless such appointment is agreed upon by Mr. Hall. In Florence, Alabama, and Fort Payne, Alabama, where there are presently existing agencies of both Integon and Jackson Life, it will be permissible for the management personnel of the Integon agencies in those two locations to continue to develop those territories while at the same time it will also be permissible for Mr. Hall to recruit and develop agents in those two locations."
The agent's and general agent's contracts Hall and Penry signed were dated November 1, 1974. The contracts, which were Integon's standard form agreements, both provided that the agent's territory was not exclusive.
After signing the agency agreements, Hall began selling Integon's policies. In July of 1978, Donald Brackin signed an agent's agreement with Integon. Initially, Brackin, who maintained an office in Muscle Shoals, was treated as a part of Hall's agency. Hall was paid a percentage of the commissions on policies Brackin sold. In August of 1979 Brackin and Hall had a disagreement. The disagreement apparently involved a type of policy which pays first-year commissions in excess of the amount of actual first-year premiums. Hall claims that Brackin bought and paid for a number of these policies, using the commissions to pay the premiums and thereby netting a profit.
As a result of the dispute, Brackin asked to be removed from the Hall Agency. Integon acceded to the request and entered into a regional general agent's contract with him on August 1, 1979, allowing Brackin to establish his own agency. The establishment of a competing agency created a conflict between Hall and Integon as to the exclusivity of Hall's general agency contract. Integon drafted a document purporting to represent an agreement between it and Hall stating that Hall's contract did not provide for an exclusive agency in the Florence area and that Hall was not entitled to commissions for the business sold by Brackin's agency. Integon informed Hall by certified mail that if he refused to sign the document his contract would be terminated. Hall refused to sign and Integon terminated his contracts.
On appeal the parties disagree as to which of the two paragraphs labeled as "amendment six" became part of the contract. From the evidence in the record, it appears that Integon offered a general agency to Hall on the terms contained in its standard form agreement and that Hall refused to sign until certain changes in the terms could be agreed on. Hall made a counter-offer in the form of the ten amendments. Hall argues that when Penry wrote to Hall that the amendments "would become part of the contract" Penry had accepted Hall's counter-offer. Hall's argument *Page 1342 
overlooks the provision in his letter to Penry stating that Penry could accept the counter-offer by affixing his signature to the foot of the list of amendments Hall had prepared. Since Penry failed to sign the list which Hall prepared, choosing instead to sign a list he himself had drafted, it appears that Penry's list of proposed amendments constituted a counter-offer rather than an acceptance. When an offeror dictates the manner in which acceptance is to be indicated, a manifestation of assent by some other means will not usually result in the formation of a contract. See 1 Williston on Contracts, § 76 (1957). Furthermore, when Penry redrafted the amendments, he made some changes in them. To be effective as an acceptance, any expression of assent restating the offer must not change the material terms of the offer. See 1 Williston on Contracts, § 77 (1957); 1 Corbin on Contracts § 82 (1963). It appears that Hall signed Integon's standard form contract the day after Penry made his counter-offer. Since reaching an agreement on the amendments was a condition precedent to the signing of the contract, it appears, by virtue of the fact that he signed the contract, that Hall was satisfied with the amendments Penry proposed. Although that conclusion appears to be the one most strongly supported by the evidence, we are not prepared to rule that it is the only possible finding which could be made from the evidence. We cannot hold that there is no genuine issue of material fact. Summary judgment is not the proper vehicle for weighing the evidence.
Furthermore, even if we were to accept the argument that Penry's amendments were agreed on by the parties, it would not follow that summary judgment was appropriate. Integon takes the position that its amendment 6 in no way restricts its rights to establish new general agents in the Florence area. That conclusion does not necessarily follow from the facts. Integon and Hall apparently entered into negotiations aimed at reaching an agreement to modify the terms of the standard form contract providing that the agency was not exclusive. If the amendment in no way restricted Integon's right to establish new agencies in the Florence area, there would have been no need to modify the standard form contract. Integon's argument presupposes that the amendment did not alter the meaning of the form contract. Hall's argument, that the amendment only gave Integon the right to add new agents to its pre-existing agencies in the area, appears to be more plausible under the circumstances. Again, however, that interpretation, while it appears to be the most reasonable, is not the only possible conclusion which could be drawn from these facts. Summary judgment was, therefore, inappropriate.
When there is no conflict in the evidence as to what the terms of the contract are, and when its terms are clear and unambiguous, the construction of the contract is within the province of the court. When, as here, there is some dispute as to its terms and it appears that the terms are ambiguous, but capable of being clarified by consideration of the surrounding facts and circumstances, a jury question is presented. MedicalClinic Board of Birmingham v. Smelley, 408 So.2d 1203, 1206
(Ala. 1981); Universal Development Corporation v. Shader,382 So.2d 1115, 1117-1118 (Ala. 1980).
 COUNT II: Fraudulent Misrepresentations Regarding the Exclusivity of the Contract
In Count Two, Hall alleged that Penry and others at Integon falsely represented to him that his agency would be the exclusive agency selling Integon's policies in the Florence area, with the exception of those Integon agencies already in existence when Hall signed the contracts with Integon. In support of its argument that summary judgment was proper as to that count, Integon makes two arguments: First, that exclusivity is not provided for in the written contract and that when parties reduce *Page 1343 
their agreements to writing, the writing is the sole expositor of the parties' agreement. Second, it argues that the claim is based on misrepresentations allegedly made in 1974, and therefore, that any actions based on those alleged misrepresentations would be barred by the statute of limitations.
Integon's first argument overlooks the fact that the count sounds in tort, not in contract. Parol evidence is always admissible to show that the written instrument was procured by fraud or that because of fraud it does not represent the true intent of the parties. Alabama Power Co. v. Pierre, 236 Ala. 521,525-526, 183 So. 665, 669 (1938).
We deem it inappropriate to address the merits of Integon's second contention. The statute of limitations is an affirmative defense which must be pleaded. A.R.Civ.P. 8 (c). Integon has not yet filed a responsive pleading. Nor did it raise the defense in its motion to dismiss. Summary judgment was, therefore, inappropriate as to count two.
 COUNT III: Breach of Agreement not to Terminate Except for Gross Misconduct
The contracts Hall signed provided that the contract could be terminated on ten days' written notice by either party. Hall claims that in 1977 he and Integon reached an oral agreement to modify his contracts to provide that they would not be terminated except for gross misconduct. The only written evidence indicating such an agreement was a letter written by an Integon vice-president to Hall stating:
 "We appreciate your visiting with us this past week and we hope that your trip was both enjoyable and profitable. As I understand the discussion we had in my office you wanted to be assured that we would not terminate your contract automatically at age 65, and that we would continue to pay service fees to you as long as you personally serviced your business.
 "Lil, this is our practice at the present time, but I will place a copy of this memo in your contract file to assure you that:
 "1. We will not automatically terminate your contract at age 65, except for gross misconduct, unless you elect to receive retirement benefits under the agent's retirement program. Present law requires us to terminate a full-time contract whenever a man elects to receive a retirement benefit. In such a case we would reissue a part-time contract with the same commissions and overrides as the previous full-time contract.
 "2. Service fees that you receive under your contract will be continued to you as long as you are personally servicing your business and your contract is in force.
 "I trust that this reassurance of our intentions in these two matters will be helpful to you and that 1977 will be your best year ever."
Hall argues that the letter supports his contention that the contract was orally modified. It would be rather anomalous, he contends, for the contract to be terminable at will until Hall reached age 65 and terminable only because of gross misconduct thereafter.
Integon argues that under the plain wording of the letter, the modification applied only to termination of Hall's contract after age 65.
Integon's argument ignores the fact that Hall did not allege that the letter embodied the agreement. He argued that the modification was oral and that the letter was evidence that the oral modification had occurred. It is clear that under Alabama law a written agreement can be modified by a subsequent oral agreement unless some statutory provision requires otherwise.Herring v. Prestwood, 414 So.2d 52, *Page 1344 
57 (Ala. 1982); Winegardner v. Burns, 361 So.2d 1054, 1057
(Ala. 1978). Summary judgment should not, therefore, have been granted as to count three.
 COUNT IV: Compensation Due Under The Terms Of The Contract
In support of its motion for a summary judgment, Integon filed an affidavit by an Integon vice-president stating, in effect, that Integon had paid Hall all the money it owed him under the terms of their agreement. Hall filed a responding affidavit stating that money was owed. Attached to the affidavit was an exhibit specifying alleged discrepancies between the amounts owed and the amounts paid. Although the exhibit details claimed discrepancies dating back to February of 1979, the trial court mistakenly granted a partial summary judgment as to all claims prior to November 1, 1979. Based on the exhibit incorporated by reference into Hall's affidavit, summary judgment should have been granted only as to claims prior to February 1, 1979, not November 1, 1979.
 COUNT V: Tortious Interference With A Contractual Relationship
Count five of Hall's amended complaint alleges that Harold Barber and Donald Brackin intentionally and maliciously persuaded Integon to repudiate and terminate Hall's contract of employment. The trial court granted a summary judgment in favor of the defendants and Hall appeals. During the pendency of the appeal Hall dismissed his claim against Barber and he proceeds only against Brackin as to count five.
Brackin argues on appeal that count five of Hall's amended complaint fails to state a claim on which relief can be granted. We disagree. A person's employment, trade, or calling is a property right, and wrongful interference therewith is actionable. Polytec, Inc. v. Utah Foam Products, Inc.,439 So.2d 683, 689 (Ala. 1983); James S. Kemper Co. v. Cox Assoc., 434 So.2d 1380, 1386 (Ala. 1983); Moving PictureMachine Op. Local No. 236 v. Cayson, 281 Ala. 468, 481,205 So.2d 222, 233 (1967); Bowen v. Morris, 219 Ala. 689, 691,123 So. 222 (1929); United States Fidelity Guaranty Co. v.Millonas, 206 Ala. 147, 89 So. 732 (1921). Furthermore, it does not defeat the plaintiff's cause of action if it is determined that the plaintiff was an at will employee. As this court noted in Millonas, supra, the fact that the employment is at the will of the employer and employee does not make it one at the will of third parties. 206 Ala. at 151, 89 So. at 735.
Summary judgment as to count five of the amended complaint was, therefore, improper.
 COUNTS VI AND VII: Wrongful Discharge
Hall argues that, assuming his contract is found to have been terminable at will, we should recognize an exception to the termination at will rule in this case.
An at will employment contract is terminable by either party for a good reason, a bad reason, or no reason at all. Bates v.Jim Walter Resources, Inc., 418 So.2d 903, 905 (Ala. 1982). We decline plaintiff's supplication to carve out an exception to the rule under the facts of this case. Summary judgment as to Hall's claims under counts six and seven is hereby affirmed.
 COUNT VIII:
Fraudulent Misrepresentation Regarding Statements That Hall Would Not Be Terminated Except For Gross Misconduct
Hall claims that Integon made misrepresentations to him in 1977 concerning *Page 1345 
the termination provisions in his contract and that, because he relied on those misrepresentations, he suffered damages. Integon's reliance on the written provisions of the contract providing for termination at will were insufficient to overcome allegations of fraud. See Alabama Power Co. v. Pierre, supra.
ORIGINAL OPINION WITHDRAWN AND OPINION SUBSTITUTED;
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, ALMON, EMBRY and ADAMS, JJ., concur.