STUART,Justice.[1]
Gambro Renal Products, Inc. (“Gam-bro”), hired The Facility Group, Inc. (“TFG”), as the general contractor for the construction of a facility designed to produce kidney dialysis filters in Opelika (“the project”). TFG contracted with the Hardy Corporation (“Hardy”) for specialized piping work on the project. Absolute Welding Services, Inc. (“AWS”), is a subsidiary of Rayco Industrial, Inc. (“Rayco”), a sub-subcontractor hired by Hardy. Although the negotiations on the subcontract at issue in these appeals were between AWS and Hardy, the subcontract was executed by Rayco and Hardy.

Facts

On December 18, 2006, AWS submitted an offer to Hardy for a certain scope of welding work that specifically excluded passivation and the installation of pure-steam return (“PSR”) piping.[2] Hardy required a performance bond; however, AWS was not approved for a performance bond. Therefore, on January 17, 2007, Rayco, which was preapproved for a performance bond, submitted an offer to Hardy on its letterhead with identical terms and exclusions as those set forth by AWS in its offer, with the exception of a minor price increase as a result of the required bond. On January 19, 2007, Hardy presented a subcontract to Rayco that provided that Hardy would pay Rayco $813,561 and Rayco would install sanitary pharmaceutical piping that would meet the requirements of specification 15202, which contains the high-purity piping and welding requirements for projects that undergo inspection by the United States Food and Drug Administration; specification 15202 requires passivation and the installation of PSR piping. Rayco and Hardy executed the subcontract, and, as Rayco neared the end of its scope of work under its understanding of the subcontract, an issue developed as to whether Rayco would provide the passivation and install the PSR piping as required by specification 15202.
The dispute centered upon whether the exclusion of passivation and the installation of PSR piping in Rayco’s January 17, 2007, offer was incorporated into the January 19, 2007, subcontract. Rayco admitted that after the dispute arose, “in the interest of assisting Hardy,” it obtained a quote from a “third-party vendor” for passivation, which Hardy refused to pay, and, according to Rayco, “[ajfter the passivation disagreement arose, Hardy refused to pay any of Rayco’s outstanding invoices for work performed on and goods purchased for the Project.”
On March 12, 2008, Rayco filed a complaint in the Lee Circuit Court against *175 Hardy, Gambro,[3] and 15 fictitiously named parties, seeking an accounting, a declaratory judgment, a reformation of the contract, and perfection of a lien. Rayco asserted claims for damages for breach of contract, unjust enrichment/quantum meruit, and “work and labor done.” On April 7, 2008, Hardy moved the Lee Circuit Court to dismiss the action against Hardy without prejudice or, alternatively, to sever and to transfer the action to the Jefferson Circuit Court based on the forum-selection clause of the subcontract specifying that all legal proceedings would be filed in the Jefferson Circuit Court. Hardy asserted that, although Rayco’s claims against Gambro were properly filed in the Lee Circuit Court, Hardy was not a necessary party in that litigation and the action in which it was a party, if not dismissed,- should be severed and transferred to the Jefferson Circuit Court. On May 20, 2008, the Lee Circuit Court granted the motion to transfer the action to the Jefferson Circuit Court.
On June 30, 2008, Hardy answered Rayco’s complaint, admitting and denying certain claims and asserting various affirmative defenses; Hardy also filed a counterclaim alleging that Rayco had breached the subcontract by failing to complete its obligations under the subcontract. Hardy further sought to add Rayco’s surety, Fidelity and Deposit Company of Maryland (“Fidelity”), as a counterclaim defendant and asserted that Fidelity had breached the subcontract performance bond. Hardy requested damages and costs and attorney fees. The trial court granted Hardy’s motion to add Fidelity as a counterclaim defendant. Fidelity answered Hardy’s counterclaim, admitting that it had entered into a subcontract performance bond with Rayco, denying that Rayco had defaulted or that it was obligated to take any action under the performance bond, and asserting various defenses.
On September 9, 2008, Rayco amended its complaint to name Travelers Casualty and Surety Company of America (“Travelers”) as a defendant. Rayco answered Hardy’s counterclaim, denying Hardy’s counterclaims and asserting various affirmative defenses. Travelers answered Rayco’s amended complaint admitting that it had issued a payment bond in favor of TFG and asserting various defenses.
On November 20, 2009, Rayco and Fidelity moved to strike Hardy’s claim for an award of attorney fees because, they said, Hardy had failed to provide certain requested discovery regarding the requested attorney fees and to identify the expert witness to testify regarding the reasonableness of the requested attorney fees for the trial.
On November 25, 2009, the trial court conducted a trial, at which ore tenus evidence was presented, and, on December 11, 2009, the trial court entered its judgment. The trial court found that on January 19, 2007, Rayco entered into a subcontract that included within its scope that all procedures, including passivation and the installation of PSR piping, necessary to a complete installation of piping to satisfy specification 15202 would be performed by Rayco; that Rayco had breached the subcontract; that Rayco owed Hardy for additional funds incurred with regard to passi-vation and the installation of PSR piping; that Hardy owed Rayco for change-order request numbers 2, 7, 8, 20, and 21 because those changes were performed at Hardy’s request or because of modifications in the plans that changed the scope *176 of the plan; and that Hardy’s other five claims for additional funds incurred in its counterclaim were disallowed because either the work was outside Rayco’s scope of work or Hardy had failed to comply with the notice requirements of the subcontract. Specifically, the trial court held that Rayco had breached the subcontract by not performing the passivation and installing the PSR piping; that Hardy owed Rayco $108,498.78 in damages; that Rayco has a duty to give Hardy all close-out documents on the project that it produced or had produced during the performance of the subcontract; that, in light of its determination that Rayco had breached the subcontract but was awarded damages for certain additional funds incurred, Rayco was not entitled to an award under the theories of unjust enrichment/quantum meruit or for work and labor done; that Rayco was not entitled to have the subcontract reformed; and that Hardy was entitled to certain additional funds incurred that were authorized by the subcontract against the amount otherwise found to be due Rayco.[4] The trial court painstakingly recounted the evidence upon which it relied. That recounting and its findings are as follows:
“1. [Hardy] invited an offer from [Ray-co] to perform the specification 15202 high purity piping work for the Gambro Plant in Opelika, Alabama, in either November or December 2006.
“2. [Rayco], through subsidiary AWS, on December 18, 2006, made an offer to [Hardy] to perform the said work for a subcontract fixed price of $810,000, the said bid excluded performance of the passivation process of the piping system once installed as is otherwise required by a 15202 installation.
“3. On December 20, 2006, the parties met and discussed [Rayco’s] offer. There is an even split in the evidence as to what transpired in the December 20, 2006 meeting. [Rayco’s] representative testified] that explicit reference was made to the fact that [Rayco] did not provide passivation services; that if [Hardy] insisted, then [Rayco] would subcontract out the work and include a mark up in its bid; and that [Hardy’s] representative demurred and stated that [Hardy] would seek another subcontractor to perform the work so as to save the mark up. [Hardy’s] representative to the said meeting, on the other hand, testified that passivation was not raised as a separate issue; that [Hardy] entered the meeting seeking a commitment from [Rayco] for a ‘turn key[5] installation[5] and that [Rayco] gave such an assurance.
“4. On January 17, 2007, [Rayco] submitted a bid in its own name, changing the amount of the bid to $813,561.00, with the same clarifications regarding passivation.
“5. On January 19, 2007, rather than accept [Rayco’s] offer of January 17, 2007, [Hardy] submitted a counter offer to [Rayco] in the form of the subcontract which included within its scope all procedures necessary to a complete installation of piping consistent with specification 15202.
*177 “6. [Rayco’s] representatives understood the requirements of a complete 15202 installation, read the January 19, 2007[,] counterproposal and, the Court infers from these two facts proven in the record, understood the document as presented to them.
“7. On January 19, 2007, [Rayco] executed the said subcontract which included within its scope passivation to be performed by [Rayco], thus accepting Defendant Hardy’s counterproposal for a ‘turn key' installation.
“8. Five change orders were requested by [Rayco] and approved by [Hardy], thus increasing the amount of [Rayco’s] subcontract by the aggregate amount of the said change order as designated in the testimony and documents.
“9. [Rayco’s] change order request numbers 1, 3, 4, 5, 6, 9-16,17,18, 19, 22, and 23 were properly denied by [Hardy] as the work is either part of the original scope or, in the case of the requested overtime or pay for idle time, contemplated by the terms of the said subcontract between the parties.
“10. [Rayco’s] change order request numbers 2, 7, 8, 20, and 21 were performed by [Rayco] either at the request of [Hardy] or because of changes in the plans and drawings approved by [Hardy] which required [Rayco] to change the scope of its performance.
“11. Regarding the six (6) charge back items claimed by [Hardy] in its counterclaim, the Court finds that the amount expended by [Hardy] for passivation to be a proper charge back under the terms of the said subcontract as well as the installation of the [PSR] piping.
“12. The Court finds that the other [five (5) ] items sought as charge backs by [Hardy] in its counterclaim are to be disallowed due either to the work being outside of [Rayco’s] scope of work, or to [Hardy’s] having failed to comply with the subcontract requirement of providing [Rayco] with forty-eight hour written notification prior to having others perform the work set forth in the said other five claimed charge back items.”
The trial court relied on Cook’s Pest Control, Inc. v. Rebar, 852 So.2d 730 (Ala.2002), for its analysis of the basic contract principles of offer, acceptance, and counteroffer. The trial court concluded that the January 19, 2007, subcontract was Hardy’s counteroffer, which was accepted by Rayco. Accordingly, it enforced the terms of the subcontract and concluded that passivation and the installation of PSR piping was within the Rayco’s agreed-upon scope of work, applied the terms to each of the 23 change-order items in dispute, and used the following calculation to award Hardy damages in the amount of $108,498.78.
To determine the amount of the damages award, the trial court started with the fee agreed upon in the subcontract— $813,561. It added to that $200,123, the amount that represented the total cost of the change orders Hardy admitted were owed to Rayco ($813,561 + $200,123 = $1,013,684). It then added the amount of $83,040.68, which represented the total cost of the change orders the trial court determined that Hardy should have approved because the changes were not within the scope of Rayco’s work as defined by the subcontract ($1,013,684 + $83,040.68 = $1,096,724.68).
The trial court then subtracted the undisputed amount of $764,604.90, the progress payments that Hardy had paid to Rayco ($1,096,724.68 - $764,604.90 = $332,119.78), and it subtracted from that the amount of $210,941, which represented Hardy’s costs to provide passivation and to install PSR piping ($332,119.78 - $210,491 = $121,628.78), and the amount of $12,680, *178 which represented Hardy’s extra administrative costs with regard to acquiring pas-sivation service ($121,628.78 — $12,680 = $108,498.78).
Finally, the trial court addressed the amount TFG owed Hardy pending the resolution of the action. The trial court determined the amount of $170,703.18 was recoverable upon resolution of this dispute and did not “charge it back against the contract balance due [Rayco].”
On December 23, 2009, Hardy moved to alter, amend, or vacate the judgment. Specifically, Hardy requested the trial court to reconsider its award to Rayco of $83,040.68 for change orders it concluded Hardy should have approved. Hardy further requested that the amended judgment should include an award of attorney fees, and, for the first time, Hardy submitted an affidavit addressing the reasonableness of the requested attorney fees. Finally, Hardy sought a clarification of the judgment to “eliminate any suggestion that Hardy was in breach of the subcontract” and to eliminate any requirement that it compensate Rayco before TFG remitted its final payment to Hardy, which Hardy referred to as the “pay-when-paid” provision of the subcontract.
On January 7, 2010, Rayco filed a post-judgment motion requesting that the trial court vacate its judgment regarding its determinations that the subcontract was a counteroffer, that “the contract” should be defined by the subcontract that included passivation and the installation of PSR piping, that Rayco was obligated to perform passivation and to install PRS piping, and that the damages award should be reduced by Hardy’s costs of performing passivation and installing PSR piping. Furthermore, Rayco requested that the trial court alter its judgment to conclude that Hardy had failed to meet its burden of proof regarding Hardy’s costs for passi-vation and for installing PSR piping and to increase the damages award by $210,941. On January 11, 2010, Rayco filed a supplement to its postjudgment motion, seeking an order vacating the finding that Hardy was entitled to be reimbursed for the administrative cost of $12,680, Hardy’s cost associated with its performance of the pas-sivation and the installation of PSR piping.
Rayco and Fidelity opposed Hardy’s postjudgment motion. Among other things, Rayco specifically contended that the trial court should deny Hardy’s request for reconsideration of an award of attorney fees because Hardy failed to provide expert testimony on the reasonableness of the requested attorney fees at trial and failed to produce in a timely manner documents reflecting the work performed by the attorney.
A hearing on the postjudgment motions was held on February 5, 2010. On March 2, 2010, the trial court denied the post-judgment motions, specifically stating that the issue of attorney fees was moot because no evidence regarding the propriety of the requested attorney fees had been presented at trial and Hardy’s posttrial affidavit was not properly before the court.
On March 22, 2010, Hardy filed a “motion for partial reconsideration” of the trial court’s denial of its postjudgment motion, which specifically addressed its request for an award of attorney fees. In the motion, Hardy asserted that its request had been “set forth in its counterclaim” and that, “[p]rior to the trial of the case, Hardy produced copies of bills reflecting legal expenses incurred by [Hardy], which were entered into evidence at trial.” Hardy further asserted that the trial court should reconsider its denial because Rayco’s motion to strike Hardy’s request for attorney fees was pending at the time of trial, and it was Hardy’s “understanding that all issues with respect to the award of [attorney *179 fees], and any objections or defenses relating thereto, would be reserved for post-trial resolution.” Hardy admitted that it had filed its affidavit regarding attorney fees after the trial had concluded. Rayco moved to strike Hardy’s motion, asserting that the trial court no longer had jurisdiction over the matter and citing Ex parte Allstate Life Insurance Co., 741 So.2d 1066, 1071 (Ala.1999) (“[A]fter a trial court denies a Rule 59 post-judgment motion, the trial court no longer has jurisdiction over the case and the aggrieved party’s only remedy is to appeal.”). There is no indication in the record that the trial court ruled on Hardy’s motion.[6]
On April 13, 2010, Hardy posted a su-persedeas bond and filed an appeal. On April 23, 2010, Rayco filed a cross-appeal pursuant to Rule 4(a)(2), Ala. RApp. P., which allows a party to an appeal to file a cross-appeal within 14 days of the first notice of appeal.
Hardy seeks this Court’s review as to three issues: Whether the trial erred 1) by adjusting the damages award based upon the “disputed change orders” (those the trial court determined Hardy should have approved), 2) by failing to address Hardy’s “requested” attorney fees, and 3) by failing to apply the pay-when-paid provision of the subcontract. In its cross-appeal, Ray-co seeks this Court’s review as to four issues: "Whether trial court erred by concluding 1) that the subcontract was the enforceable contract, 2) that the subcontract was a counteroffer, 3) that Hardy had presented sufficient evidence establishing the cost of performing passivation and installing the PSR piping, and 4) that Rayco’s damages should be offset by Hardy’s extra administrative expenses with regard to passivation and the installation of PSR piping.

Standard of Review

“Where evidence is presented to the trial court ore tenus, a presumption of correctness exists as to the court’s findings of fact; its factual determinations will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Gaston v. Ames, 514 So.2d 877, 878 (Ala.1987); Cougar Mining Co. v. Mineral Land & Mining Consultants, Inc., 392 So.2d 1177 (Ala.1981).”
Valley Steel Constr., Inc. v. Addison Fabricators, Inc., 658 So.2d 352, 353 (Ala.1994).
Analysis
Initially, this Court must determine whether an enforceable contract existed between Hardy and Rayco, an issue raised in Rayco’s cross-appeal; therefore, we address the issues presented in Rayco’s cross-appeal first.
Appeal No. 1091011 — Rayco’s Cross-Appeal
I. Whether the Trial Court Erred by Concluding that the Subcontract was the Enforceable Contract
Rayco contends that the trial court erred in concluding that the subcontract was the enforceable contract because, it says, Rayco and Hardy had reached an agreement on the terms and scope of the work to be performed by Rayco, as evi *180 denced by the two written proposals and the discussions occurring on or before January 2, 2007. Rayco reasons that the written subcontract submitted by Hardy on January 19, 2007, was to memorialize the terms of the existing contract.
“ ‘The requisite elements of [a contract] include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract.’ Strength v. Alabama Dep’t of Finance, Div. of Risk Mgmt., 622 So.2d 1288, 1289 (Ala.1993); Steiger v. Huntsville City Bd. of Ed., 653 So.2d 975, 978 (Ala.1995).”
Ex parte Grant, 711 So.2d 464, 465 (Ala.1997).
The trial court was presented with conflicting testimony as to when Hardy accepted Rayco’s offer and when the parties assented to the terms essential to the formation of the contract. Representatives of Rayco insisted that they consistently stated that Rayco would not provide passivation and installation of PSR piping. Representatives of Hardy stated that throughout the discussions of the contract Hardy insisted that it wanted an “all-inclusive” contract that included the performance of passivation and the installation of PSR piping.[7] The trial court concluded that the subcontract executed on January 19, 2007, evidenced the formation of the agreement because it defined the terms of performance. Where, as here, the evidence regarding the formation of the contract is presented ore tenus, the findings of the trial court are entitled to a presumption of correctness. This Court will not reweigh the evidence, and Rayco has not established that the trial court’s conclusion that the subcontract of January 19, 2007, defined the obligations of the parties was clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. See Valley Steel Constr., supra.
II. Whether the Trial Court Erred by Concluding that the Subcontract was a Counteroffer
Rayco contends that the trial court erred in concluding that the subcontract was a counteroffer because, it says, Rayco and Hardy had completed negotiation of the terms of the contract as of January 2, 2007, and a legally binding contract was formed at that time. The trial court, in reaching its conclusion that the January 19, 2007, subcontract constituted a counteroffer to which Rayco assented, applied the following reasoning from Cook’s Pest Control, Inc., 852 So.2d at 736-37:
“ ‘In the process of negotiation concerning a specific subject matter, there may be offers and counter-of *181 fers. One party proposes an agreement on stated terms; the other replies proposing an agreement on terms that are different. Such a counter-proposal is not identical with a rejection of the first offer, although it may have a similar legal operation in part. In order to deserve the name “counter-offer,” it must be so expressed as to be legally operative as an offer to the party making the prior proposal. It is not a counter-offer unless it is itself an offer, fully complying with all the requirements that have been previously discussed. This does not mean that all of its terms must be fully expressed in a single communication. Often they can be determined only by reference to many previous communications between the two parties. In this, a counter-offer differs in no respect from original offers. But there is no counter-offer, and no power of acceptance in the other party, unless there is a definite expression of willingness to contract on definitely ascertainable terms.
“ ‘If the party who made the prior offer properly expresses assent to the terms of the counter-offer, a contract is thereby made on those terms. The fact that the prior offer became inoperative is now immaterial and the terms of that offer are also immaterial except in so far as they are incorporated by reference in the counter-offer itself. Very frequently, they must be adverted to in order to determine what the counter-offer is. Often, the acceptance of a counter-offer is evidenced by the action of the offeree in proceeding with performance rather than by words.
“‘... If the original offeror proceeds with performance in consequence of the counter-offer, there can be no successful action for breach of the terms originally proposed.
“ ‘The terms “counter-offer” and “conditional acceptance” are really no more than different forms of describing the same thing. They are the same in legal operation. Whether the word “offer” is used or not, a communication that expresses an acceptance of a previous offer on certain conditions or with specified variations empowers the original offeror to consummate the contract by an expression of assent to the new conditions and variations. That is exactly what a counter-offer does. Both alike, called by either name, terminate the power of acceptance of the previous offer.’
“Joseph M. Perillo, Corbin on Contracts § 3.32 at 478-80; § 3.35 (rev. ed. 1993) (footnotes omitted).”
Our review of the record indicates that the trial court’s conclusion that the subcontract constituted a counteroffer that Rayco accepted is supported by the evidence and is not clearly erroneous or against the great weight of the evidence. The evidence indicates that Hardy did not accept the terms in Rayco’s offer but instead proposed terms for the contract that included the performance of passivation and the installation of PSR piping, as provided in specification 15202. See Hall v. Integon Life Ins. Co., 454 So.2d 1338 (Ala.1984) (noting that a response of a party that makes changes to the material terms of the offer is a counteroffer). Any conflicts in the testimony regarding the negotiations of the terms of the contract were for the trial court, not this Court, to resolve.
III. Whether the Trial Court Erred by Concluding that Hardy had Presented Evidence Indicating the Costs of Performing Passivation and Installing PSR Piping
Rayco contends that, even if this Court concludes that Rayco was obligated *182 to perform the passivation and to install PSR piping as provided in specification 15202, the trial court erred in awarding Hardy the amount it incurred in performing the passivation and installing PSR piping. According to Rayco, the passivation and PSR piping specifications were “amended” or “changed,” and those changes increased the cost of passivation and installing PSR piping after the execution of the contract. Rayco reasons that it could be held liable only for the cost of performing passivation and installing PSR piping pursuant to the original specifications and that it should not be liable for any increased cost of performing passivation and installing PSR piping as a result of the amended specifications. Rayco’s argument, however, fails because the record does not establish that Rayco presented argument and evidence to the trial court with regard to the changes in the cost of performing passivation and installing PSR piping under the original specifications as compared to the cost of performing passi-vation and installing PSR piping under the amended changes. Because Rayco did not develop a record contesting Hardy’s evidence of cost, we cannot conclude that the trial court erred. See Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 176 (Ala. 2000)(“[W]e cannot assume error or presume the existence of facts as to which the record is silent.”).
IV. Whether the Trial Court Erred by Concluding that Rayco’s Damages Should be Offset by Hardy’s Extra Administrative Expenses
Rayco contends that the trial court erred in deducting from its damages award $12,680, which is the amount of the premium paid by Hardy to purchase a bond to “bond off’ Rayco’s lien. According to Rayco, because it was owed for its work on the project, Rayco had a valid lien on the project. The evidence indicated that Hardy was entitled to retain the balance owed Rayco pending resolution of the disputed issues and that Hardy had obtained a payment bond that afforded Rayco a complete remedy if the trial court found that the funds were owed Rayco.
During the questioning of Bradley Cor-dell, Hardy’s project manager, the following testimony was elicited:
“[Hardy’s counsel]: The bond premiums, Brad, what is that?
“[Cordell]: Rayco filed a lien on the building. And our contract with [TFG] require[d] us to bond off all liens, and so we bonded off [Rayco’s] lien. And those are the fees we incurred from our bonding company.
“[Hardy’s counsel]: And Rayco filed the lien even though Hardy Corporation had posted a payment bond from Travelers; correct?
“[Hardy’s counsel]: Yes.
[[Image here]]
“[Rayco’s counsel]: And you understand that if the Court awards any compensation to Rayco including its base contract, that that amount of money [the bond premium] — you would agree that amount of money is not due to be paid to you, wouldn’t you?
“[Cordell]: I mean, I’m not going to make a decision for the Court. My opinion is [Rayco] filed the lien unjustly. And we had to bond it off and that we should be compensated for that.”
A review of the record supports the trial court’s award of the premium cost to Hardy.
Appeal No. 1090988 — Hardy’s Appeal
I. Whether the Trial Erred by Adjusting the Damages Award Based upon the “Disputed Change Orders”
Hardy disputes the trial court’s damages award to Rayco on the change *183 orders in the amount of $83,040.68. The terms of the subcontract required Rayco to submit “claims for extras” upon completion of extra work. Hardy denied several claims for “extras” because it determined that those extras were within the scope of Rayco’s work as defined by the subcontract. Rayco disagreed at the trial. The trial court reviewed all the claims for “extras” and, based upon disputed testimony and exhibits that were admitted into evidence, determined that some of the extras were properly denied and that some of them were not.
Hardy argues, as it did at trial and in its postjudgment motion, that the trial court erred in awarding these damages because, it says, Rayco’s claimed extra work was not a “change in scope,” Rayco did not, as the subcontract required, obtain written approval in advance from the project manager for the extra work, and Rayco waived its claims to additional compensation for the extra work in its “payment applications” or “lien wavers.”
First, Hardy asserts that no factual basis exists for the trial court’s determination that the work in the change orders constituted a change in the scope of the work to be performed by Rayco. Here, the trial court heard testimony and studied the exhibits regarding 23 change orders Hardy had denied. The trial court subtracted amounts due on only 5 of the 23 change orders, finding that “[Rayco’s] change order request numbers 2, 7, 8, 20, and 21 were performed by [Rayco] either at the request of [Hardy] or because of changes in the plans and drawings approved by [Hardy] which required [Rayco] to change the scope of its performance.”
“ ‘ “ ‘ “Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court....”’ Ex parte Roberts, 796 So.2d 349, 351 (Ala.2001) (quoting Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996)). ‘When the evidence in a case is in conflict, the trier of fact has to resolve the conflicts in the testimony, and it is not within the province of the appellate court to reweigh the testimony and substitute its own judgment for that of the trier of fact.’ Delbridge v. Civil Serv. Bd. of Tuscaloosa, 481 So.2d 911, 913 (Ala.Civ.App.1985). ‘[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.’ Ex parte Foley, 864 So.2d 1094, 1099 (Ala.2003) (citations omitted).” ’
“Friedman v. Friedman, 971 So.2d 23, 28 (Ala.2007) (quoting Ex parte R.E.C., 899 So.2d 272, 279 (Ala.2004)).”
Curry v. Russell Cnty. Bd. of Educ., 125 So.3d 711, 717 (Ala.Civ.App.2013). The trial court resolved the conflicts in the testimony, and this Court will not substitute its judgment for the trial court’s on appeal.
Second, Hardy’s argument that Rayco failed to obtain written approval, in advance, of the changes is unpersuasive. Again, the trial court was presented with conflicting testimony with regard to the various changes made on the project and how or why those changes occurred. The trial court concluded that those particular changes were for changes in Rayco’s scope of work, i.e., the changes were either required by or requested by Hardy. The trial court properly resolved the conflicts, and this Court will not reweigh the evidence. Curry, supra.
Finally, Hardy contends that Rayco was not entitled to this damages award because, it says, Rayco waived any claim for payment for “extra work” in the three “pay applications” or “lien waivers,” which were admitted into evidence at the trial.
*184 Each pay application submitted by Rayco contained the following lien-waiver language:
“To induce Hardy Corporation to pay the amount of this requisition, the undersigned hereby forever waives, relinquishes, releases, and discharges all liens and claims of liens that the undersigned has or shall have upon the property described in the subject subcontract and all improvements thereon, for all labor and/or materials furnished to said property through the last day of the current month, said waiver to be effective upon payment for the amount of the requisition. There are no additional costs or claims of any kind for any extras or additions of work, labor, material, or otherwise on the Project, except as stated above.”
(Emphasis added.)
In Southland Quality Homes, Inc. v. Williams, 781 So.2d 949 (Ala.2000), this Court recognized that when an instrument is unambiguous, its construction and legal effect will be based upon what is found within the four corners of the instrument.
Here, the lien-waiver language is unambiguous. Rayco’s pay applications that contained the lien-waiver language also included requests for payment for change-order request numbers 2, 7, 8, 20, and 21. The evidence indicates that Hardy refused to pay those change orders. The language in the pay application is unambiguous; Rayco’s promise to waive any liens was contingent on the payment of the underlying invoices. Therefore, even though Ray-co did execute the lien waivers, because Hardy did not pay Rayco for the underlying invoices, the trial court did not err in awarding Rayco payment from Hardy for change-order request numbers 2, 7, 8, 20, and 21.
II. Whether the Trial Erred by Failing to Address Hardy’s “Requested” Attorney Fees
“Whether to award or to deny attorney fees lies within the sound discretion of the trial court. On appeal, the trial court’s ruling on that question is subject to reversal only upon a showing of abuse of discretion. Advertiser Co. v. Auburn University, 579 So.2d 645 (Ala.Civ.App.1991).”
Battle v. City of Birmingham, 656 So.2d 344, 347 (Ala.1995).
On June 30, 2008, Hardy requested an award of attorney fees in its counterclaim. On November 20, 2009, Rayco and Fidelity moved to strike Hardy’s claim for attorney fees because, they said, Hardy had neither complied with their discovery requests for an affidavit addressing the reasonableness of the attorney fees nor produced the name of the expected trial witness regarding the reasonableness of the attorney fees. Hardy opposed the motion to strike; the trial court did not rule on the matter before trial. The only mention of the issue of attorney fees at trial was during Cordell’s testimony. The record provides:
“Q [Hardy’s attorney:] Has Hardy incurred legal expenses in the defense of this case?
“A [Cordell:] Yes.
“Q [Hardy’s attorney:] Are the invoices from our firm provided and attached as tab eleven?
“A [Cordell:] Yes.
“Q [Hardy’s attorney:] And are they summarized — “[Rayco’s attorney]: Sorry. Go ahead.
“Q [Hardy’s attorney:] — at the front of that section?
“A [Cordell:] Yes.
“[Rayco’s attorney]: Your Honor, we would object to the entry of any of *185 this evidence on attorney fees. There is no expert testimony. These fees were only given to us when we got these books on Friday. And we move to strike any request for attorney fees at this time.
“[Hardy’s attorney]: We have a motion pending on that, Your Honor. It’s fíne if we defer that. I don’t know if [Rayco’s attorney] wants to get into that now, but I just want to— the bills are in evidence.
“THE COURT: All right.”
Hardy did not raise the issue again during the trial, and the trial court’s judgment did not address Hardy’s request for attorney fees. On March 2, 2010, the trial court denied Hardy’s postjudgment motion with a specific statement that the issue of attorney fees was moot because no evidence regarding the propriety of the requested attorney fees had been presented at the trial and that Hardy’s posttrial affidavit was not properly before the trial court.
Our review of the record indicates that the trial court exceeded the scope of its discretion in refusing to consider Hardy’s request for attorney fees. The record indicates that Hardy’s counsel stated that he would defer presentation of evidence with regard to attorney fees until after the trial court determined whether Rayco had breached the contract that provided for an award of attorney fees and that the trial court agreed. Although the communication between the trial court and counsel is not a model of clarity, a reasonable reading of the record establishes that the trial court agreed to provide Hardy an opportunity to present argument and evidence with regard to an award of attorney fees after a determination was made as to whether Rayco had breached the contract. Therefore, the trial court’s judgment in this regard is reversed.
III. Whether the Trial Court Erred by Failing to Apply the “Pay-when-Paid” Provision of the Subcontract
Hardy contends that the trial court erred in failing to order that Hardy was not required to pay Rayco the amounts due until Hardy had received final payment from TFG. The subcontract provided:
“Section 9.... Final payment shall be thirty (30) days after completion of the Project provided it shall not be due or owed from contractor or contractor’s surety unless and until, as conditions precedent (1) the Subcontractor has met the requirements and conditions of the Subcontract; (2) Contractor has received final payment for Subcontractor’s work from the general contractor, (3) Subcontractor has furnished a final lien waiver at release to contractor and owner, and (4) Subcontractor has properly furnished all project closeout documents to Contractor based upon the breach or impending breach of any provision by the Subcontractor or based upon the assertion of reasonable likelihood of assertion, of any lien, claim, garnishment, attachment, or other levy until such breach, controversy, lien, claim, or garnishment or other levy has been resolved.”
(Emphasis added.)
The evidence presented at trial established that the only amount TFG owed Hardy was $170,703. The testimony did not establish that this amount was for work performed by Rayco. Therefore, Hardy has not established that this condition of the subcontract is applicable or that the trial court erred in this regard.

Conclusion

Based on the foregoing, in Rayco’s cross-appeal (appeal no. 1091041), the judgment of the trial court for Hardy is affirmed; in Hardy’s appeal (appeal no. *186 1090988), the judgment of the trial court for Rayco is affirmed in part and reversed in part, and this case is remanded for proceedings consistent with this opinion.
1090988 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
1091041 — AFFIRMED.
BOLIN, PARKER, SHAW, MAIN, WISE, and BRYAN, JJ„ concur.
MOORE, C.J., and MURDOCK, J., concur in the result.

. These cases were inadvertently placed on this Court’s administrative docket in September 2011 and were not assigned to Justice Stuart until October 16, 2013. This Court regrets the delay in the issuance of the decisions in these appeals.

. Passivation is a process by which the rate of corrosion of metal, such as stainless steel, is slowed by the application of a thin, transparent oxide film. PSR piping is used to inhibit the presence of bacteria in piping or tubing. As will be discussed infra, performing passi-vation and installing PSR piping on the project eventually required a $210,941 expenditure.

. On May 9, 2008, upon the stipulated agreement of Rayco and Gambro, the Lee Circuit Court entered an order dismissing Gambro from the action.

. The trial court’s order did not specifically address the claims against Fidelity, Rayco’s surety. However, because the trial court found that Rayco did not owe Hardy money, that is, that Rayco did not have any damages liability, the trial court implicitly found that Fidelity had no liability. Cf. Browder, Adm’r v. Faulkner, 82 Ala. 257, 260, 3 So. 30, 32 (1886) ("Without a judicial ascertainment of the default of the principal, no liability arises, and an action can not be maintained against the surety.”).

. A "turn key” installation is an installation that is complete and ready to operate.

. The trial court apparently correctly determined that it lacked jurisdiction to consider Hardy’s successive postjudgment motion because Hardy was not aggrieved in any of the ways contemplated by Ex parte Dowling, All So.2d 400, 404 (Ala. 1985). Simply, there was no new judgment and the issue of attorney fees not only could have been, but was, raised in Hardy's first postjudgment motion. Therefore, Hardy's proper avenue for relief was a timely appeal.

. Our review of the record indicates that this case is clearly distinguishable from Buckmas-ters, Ltd. v. Action Archery, Inc., 915 F.Supp. 1188, 1195-96 (M.D.Ala. 1996). In Buckmas-ters, the testimony indicated that the representative of Auction Archery "lulled” Buck-masters into thinking that the submitted written contract for execution contained only one minor change; therefore, the court concluded that Buckmasters was not barred from rescinding the written contract because the written contract did not reflect the agreed-upon terms. Here, conflicting evidence was presented as to whether Hardy agreed at any stage in the discussions during the formation of the contract that Rayco would not be responsible for passivation and the installation of PSR piping. The trial court's resolution of this disputed issue is supported by reasonable inferences to be drawn from the ore tenus evidence. See Weeks v. Herlong, 951 So.2d 670, 679 (Ala. 2006) ("When the trial court receives evidence ore tenus and resolves a conflict of fact in favor of one party, this Court will not substitute its judgment for that of the trial court unless the trial court's decision is palpably erroneous or manifestly unjust. Phil-pot v. State, 843 So.2d 122, 125 (Ala.2002).”).